### SEYMOUR *v.* FREER.

1. In May, 1835, an agreement was entered into between Price and Seymour, which provided, on the part of Price, that he should devote his time and best judgment to the selection and purchase of land, to an amount not exceeding five thousand dollars, in certain designated States and Territories, or in such of them as he might find most advantageous to the interest of Seymour; that the purchases should be made during the then existing year, and that the contracts of purchase should be made, and the conveyances taken in the name of Seymour; and on the part of Seymour, that he should furnish the five thousand dollars; that the lands purchased should be sold within five years afterwards, and that of the profits made by such purchase and sale, one-half should be paid to Price, and be in full for his services and expenses. Under this agreement, lands having been purchased by Price and the title taken in the name of Seymour; *Held,*

  i. That Seymour took the legal title in trust for the purposes specified; that is, to sell the property within the time limited, and, after deducting from the proceeds the outlay, with interest and taxes, to pay over to Price one-half of the residue; and that, to this extent, Seymour was a trustee, and Price the *cestui que trust.*

  ii. That the trust continued after the expiration of the five years, unless Price subsequently relinquished his claim; the burden of proof as to such relinquishment resting with the heirs of Seymour.

  iii. That the principle of equitable conversion being applied to the case, and the land which was to be converted into money, being regarded and treated in equity as money, the personal representative of Price was the proper person to maintain this suit, and it was not necessary that his heirs-at-law should be parties.

2. The statute of limitations has no application to an express trust where there is no disclaimer.

APPEAL from the Circuit Court for the Northern District of Illinois.

On the 9th of May, 1835, Henry Seymour, residing at Utica, New York, and Jeremiah Price, residing at Chicago, Illinois, entered in New York, into a contract, thus:

"The said Price agrees that he will *forthwith* devote his time and attention, and exercise his best judgment, in exploring and purchasing land, to an amount not exceeding $5000, in the States of Illinois, Indiana, and Ohio, and in the Territories of Michigan and Wisconsin, or in such of them as he may find most

advantageous *to the interest of said Seymour,* in whose name the contracts and conveyances shall be made and taken. The purchases shall be made after full and careful searches and explorations, for the most profitable investments, on or near the sites or expectant sites of towns or places of business, and, in general, in tracts of ground of moderate extent; and the said Seymour covenants, on his part, to furnish $5000 for the above contemplated purchases, and that the lands, purchased as aforesaid, *shall be sold within five years from the present time* and *out of the profit* which may be made by *such* purchase and sale (after charging to the investment, the taxes and other charges, if any, together with 7 per cent. interest on the investment and the charges last mentioned), there shall be paid to the said Price, one-half of the same, *which one-half of the profit shall be in full of his services and expenses of every kind* in making the aforesaid explorations, searches, and in doing all such other things as may be requisite and proper in making the contemplated purchases. It is understood that the purchases shall be made during the *present* year, and that *no* payment for services or expenses will be made by said Seymour, *except* from the profits made *as aforesaid.*"

Contemporaneously with the making of the contract, Seymour placed into the hands of Price the $5000 mentioned in it. And between June and October, 1835, Price bought about thirty pieces of land in Illinois, thus using all the money.

The lands were unproductive, and consisted, in their sundry parcels, of two thousand four hundred and forty acres, and some village lots, situate in Joliet. It was all conveyed to Seymour.

In August, 1837, Seymour died; he left two sons, viz, Horatio and John F., and four daughters, two of them being, at his death, and at the expiration of the five years mentioned in the contract, infants. By his will, he appointed Horatio, John F., and another, his executors; and his real estate, under the directions of his will, went to his heirs, except the share of one daughter, which was vested in trustees.

No part of the land was sold during the five years specified in the contract. It was admitted of record that, at the expiration of the time for sale, stated in the contract (May,

1840), the lands were unsalable, and that it was entirely uncertain how much they could have been sold for, or whether they would ever have brought enough to repay the original investment and interest.

During the five years, there were no taxes upon, or expenses as to the lands purchased, except taxes upon the lots in Joliet, amounting, in all, to $19.33. These were paid by Price, with money furnished by Seymour. Subsequently to the five years, Price, till his own death, in 1854, paid the taxes on the lands; Seymour's executors furnishing him the money to pay them, as also to pay any small expenses he was put to.

The accounts of Price (independently of the outlay for the purchase, and in which all the taxes and expenses just spoken of were entered), began March 4th, 1837. They were headed:

"Account of payments on account of H. Seymour."

They began 24th December, 1841, comprised eighty-four items amounting to $2054, and ran to near the date of Price's death in July, 1854, terminating 16th June, 1854. The items were chiefly of taxes on the different pieces of property. But there were several charges for postage on letters, for a small item of travelling expense in paying taxes, for interest on small sums advanced to pay taxes, &c., and one in March, 1845, of $1.53 paid as a charge for advertising a county tax, "because," said the account, "*funds not sent.*" But there was no charge or claim for services by Price or any other person as agent. In fact, in one or more instances he apparently suffered lands to be sold for taxes. At the date of Price's death all Price's charges for taxes paid and for these small outlays had been settled; Seymour's executors having sent him, from time to time, and apparently as informed of them, checks for the sums due. Between December, 1841, and Price's death in July, 1854, the executors had thus sent him about sixteen different checks.

Price, as already said, died in July, 1854, in Illinois. John High became his administrator. High now looked

after the lands; under what exact source of interest was a matter disputed. His accounts of money received and of lands sold were thus headed:

" Account of money received from heirs and devisees of Henry Seymour, deceased (after his decease and after decease of Jeremiah Price), by John High, Jr., as agent for heirs and devisees, to pay taxes and other expenses on lands aforesaid."

" Account of sales made by John High, Jr., as agent for estate, heirs and devisees of Henry Seymour, deceased, from lands purchased by Jeremiah Price, deceased."

In 1855 and 1856, High negotiated sales of portions of the land, which were consummated by contracts executed by the heirs and the purchasers. The sales were profitable. Two hundred acres were sold for $69,200; and High now, as administrator of Price, alleging that the original outlays, costs, and interest had been repaid, claimed one-half the surplus; contending that he was entitled to it under the contract of 1835. The representatives of Seymour not being of this opinion, High (who dying in the course of the suit was succeeded by Freer), now, February, 1857, filed a bill in the court below against all the executors of Seymour, his heirs-at-law, and the trustees of the cestui que trust's daughter.

The bill set out the contract, stated that no sales had been made within the five years, and that Price had not insisted on their being so made, because it was thought that the interest of all parties would be promoted by holding on for better times, but that nothing was done to release Seymour or his representatives from their original obligations; that High, after Price's death, had acted as agent of Seymour's representatives, and effected sales; and that the original $5000, interest, &c., being all refunded, and the surplus being clear profits, he, High, as administrator, claimed one-half of it for the estate of Price, and that he had always been and was now ready to agree upon and define the relative rights of the two estates, and divide the profits, but that

in consequence of the number of the parties interested, on Mr. Seymour's part, the distance of their residence from the subject-matter, the death of the original party, and the intervention of descents, marriages, &c., and from the refusal of several of the parties so in interest to admit Price's rights, he was afraid that in case the residue of the lands should be sold out, and the whole converted into money and be allowed to go into the hands of Seymour's representatives, he would, owing to their number and to the fact of their residence being without the jurisdiction of the courts of the State where the whole profits had been made, lose Price's share; on which account as he conceived the interposition of a court of equity was necessary. *Price's heirs were not made parties to the bill.*

The answer, admitting the agreement, purchase, and advance of money, stated that the lands were situated near Price's residence, and being wild required no particular care; that during the five years Price did nothing except what was required of him by his agreement; that at the death of Seymour one of the defendants was a married woman, and two others were infants. It denied that the omission to sell during the five years was for the benefit of the defendants, but averred, on the contrary, that both Seymour, in his lifetime, and the defendants, afterwards, had at all times been anxious to sell if they could do so without loss. It denied that Price did not waive a right to have the property sold within five years, but averred, on the contrary, that he did. It averred, moreover, that Price always treated the defendants as the sole owners, and solely entitled to the proceeds, and never pretended to have any interest; that he refused to pay the taxes or any portion of them; "but claimed that he ought to be allowed a reasonable compensation for his services as agent, and not under the contract;" that the defendants had always been willing to allow him such compensation. It set up further that by the legal effect of the agreement Price's interest was to be half the profits to be got upon a sale to be made in five years, and averred that no profits on sales could be made or were made within

that time; and averred that the defendants had in no way continued or extended the agreement with Price.

As to any claim for a breach of the agreement in not selling in five years, the answer pleaded the statute of limitations.

As to the agency and the expenditures of High, it stated that after the death of Price he, High, was requested by Horatio and John F. Seymour to find purchasers for the land if he could; but that he had no other power respecting the lands; that the contracts for the parcels sold were executed by the defendants and not by High; that the negotiations for such sales were made by the defendants through High, and were subject to the ratification of the defendants, and that High was not employed in consequence of any relationship which he had to Price or to his estate, or on account of the agreement between Henry Seymour and Price.

Finally, it denied that any cause existed for the interposition of a court of equity, submitted that the defendants were improperly joined, for the want of a common interest among them, and asserted that no receiver was wanted, the devisees of Seymour being all well known as citizens of New York, and fully competent to dispose of the lands without the aid of a receiver, and not wanting in ability to refund, &c.

General replications were filed. No proofs were taken, nor did it appear from the evidence, that any letters from either side were called for or produced. Certain facts were admitted.

An interlocutory decree making a reference to a master adjudged that Price, by virtue of the agreement of 1835, was "entitled, as an equal copartner" in the property to one equal half of the net profits made, or to be made from the sales; that the lands having been purchased by Price as an "adventure or investment on joint account of himself and said Seymour," the sales already made and the sales yet to be made were to be deemed and taken as made, and to be made "on joint account" of the estates of Seymour and Price.

The final decree recited the former decree and a master's

report made to enable the court to administer the property
on "just partnership principles," and, after making a dis-
position of the proceeds of sales of the lands, it provided
that "the balance which shall remain thereof being clear
profits of the *partnership* land purchase and sale up to the
present time, be equally divided between the parties in this
suit: one-half to the complainant, and the other half to be
held by the heirs and devisees of Henry Seymour, deceased."
And it spoke of "closing and selling the partnership ac-
counts so far as the sales and collections have progressed."

The solicitor of the complainants, by consent of parties,
was appointed receiver, with an agreement that he might sell
at private sale.

The representatives of Seymour brought the case by ap-
peal here.

*Messrs. Kernan and Denio, for the appellants:*

This contract, by its terms, plainly excludes implication
that the lands are subject to the rules of law applicable to
partnership property. The view of the court below is
directly in the face of the authorities, including one in this
court.*

The main question then is the interpretation of the con-
tract and whether, no sales having been practicable within
the five years, the old arrangement either remained or was
re-established?

The contract is one *sui generis.* The year in which it was
made was an era of great activity in settling lands in the
West. "Sites or expected sites of towns or places of busi-
ness" were sought for with avidity, and they doubled in
value or increased in a yet greater ratio in a few months, in
the hands of the possessors. Mr. Seymour was disposed to
enter into this field with a considerable sum of money, and
Price, who it is to be presumed had local knowledge and an
aptitude for selecting lands, was willing to aid Seymour with

---

* Berthold *v.* Goldsmith, 24 Howard, 536, 542; Hesketh *v.* Blanchard, 4
East, 144; Vanderburgh *v* Hull, 20 Wendell, 70, 71.

his local knowledge and active agency for a collateral consideration precisely defined. The question was, how this consideration should be arranged. It was resolved that Seymour should become the purchaser with his own moneys, and Price the purchasing agent, and that the latter should receive (instead of a *per diem* allowance, or a commission on the amount of the investment, or the interest of a partner in the *ultimate* profit or loss), one-half of the profits to be got on a sale of the lands within five years, and should have no such interest as would in any event subject him to a loss or compel him to advance money. This, at least, is what is specified in precise language. The enterprise was to be rapidly conducted and speedily wound up. Price was to set about the purchases *forthwith*. The purchases were all to be made in the then *present year*, and the lands were all to be sold within five years; and the compensation of Price was expressly made to depend upon, and be measured by the results of a transaction *thus* to be carried on and consummated. And to preclude any pretence of a claim in any other aspect, it is twice inserted that his compensation is to be limited to a moiety of the profits thus arising, and that he is to have no other compensation.

Such a contract was, in that day, a reasonable one, and there is no ground for believing that the parties meant something beyond what they said.

If this is so, the land having become unsalable in 1840, the representatives of Price had not, at the commencement of this suit, any interest in the proceeds of the land subsequently sold or in the unsold lands remaining.

If, however, the representatives of Price have any interest in the profits, the remedy is by an action of law upon the contract. There is no suggestion that if in such an action the plaintiff establishes his rights to a half of the profits, the defendants are not able and willing to pay him.

The rights of Price and his representatives were barred by the lapse of time.

Any personal action for not selling in five years was long since barred by the statute, as the answer sets up.

The remedy in equity, if there was any, is sought after the lapse of so long a period that upon settled principles of equity the demand will not be enforced. It will be considered a stale demand.

In addition to the defence of a bar by the statute, and to the defect of misjoinder of Seymour's executors in a matter where they had no interest, the bill omits to make Price's heirs a party. If Price's estate has any interest in the matter, they are chiefly interested and should be parties.

Price died in July, 1854, more than fourteen years after the alleged default in selling. He never, during his lifetime, once requested that the lands should be sold, or made any claim to an *interest* in them. The heading of the accounts negatives all such ideas. The fact that he attended to the payment of taxes with money remitted by Mr. Seymour's representatives, is quite consistent with the character of an agent, and that he let the lands be sold rather than pay taxes himself, is consistent with no other idea. High's accounts show that he was employed by the heirs and devisees of Seymour *as their agent.* The fact that they both acted distinctly as agents, rather rebuts the idea of any other relation. It is a circumstance of weight that a peremptory sale at any time during these twenty years would have resulted in a loss which Seymour's representatives must have borne alone, as Price and his representatives were in no way bound to contribute; as it also is that during all this time the burden upon the devisees of Seymour was increasing at a rapid rate by the accumulation of interest and taxes and the expenses of agency. Good faith required, on both accounts, that Price should have advised the other party that he claimed a continuing interest, if such was the fact. All idea of a continuance of the contract by mutual consent is thus repelled. But, as the contract looked solely to a sale in five years, and limited the interest of Price to the profits to be made upon *such* a sale, it required a plain understanding on both sides to continue and extend the arrangement to sales to be made afterwards.

By the decree the heirs of Seymour are deprived of all

authority and control over the lands; title is taken from them and vested in a receiver. But there is no allegation that Seymour or his heirs have violated their duty under the contract; nor that they acted improvidently in disposing of the land sold; or that there is any apprehension that they will not dispose of the residue for the best interest of all concerned. They reside where Mr. Seymour did when the contract was made, and are responsible persons. The only ground of complaint is, that the appellants deny that, by the contract, they are bound to pay over to the representatives of Price a share of the proceeds of the land after the same are sold. But this is not an adequate cause for equity to compel a specific performance. Much less does it authorize the court to take the property from the appellants and place it in the hands of a receiver, to be sold by *him*.

*Mr. Mather, contra*, argued at length that the case was one of partnership, citing numerous authorities, and that at all events the evidence showed that both Price and High regarded Price as interested, he having no compensation otherwise than in an ultimate share of profits for his many years of service; that selling had gone off without default on either side; the thing being nursed along till a good price could be got; that the case being one of partnership and trust, chancery had special jurisdiction; that the statute did not run against a trust; that there were no laches; and that the relief given was but adequate and proper.

Mr. Justice SWAYNE delivered the opinion of the court.

The contract which lies at the foundation of this suit, was entered into by Jeremiah Price and Henry Seymour on the 9th of May, 1835. Upon looking into it carefully, we find it contains the following provisions:

Price agreed that he would devote his time and attention and exercise his best judgment, in purchasing lands to an amount not exceeding $5000, in the States of Indiana, Illinois, and Ohio, and in the Territories of Michigan and Wisconsin, or in such of them as he should find most advantage-

ons for the interest of Seymour: the contracts were to be made and the conveyances to be taken in Seymour's name: the purchases were to be made after full and careful search for the most profitable investments "in or near the sites or expected sites of towns or places of business," and in general in tracts of land of moderate extent: Seymour agreed to furnish $5000 wherewith to make the purchases contemplated: that the land so purchased should be sold within five years from the date of the contract: that after charging the investment, the taxes, and 7 per cent. interest on the investment, there should be paid to Price one-half of the profits which should be made: it was agreed that this half of the profits should be in full for Price's services and expenses of every kind in making the explorations and searches, and in doing all such other things as should be requisite and proper in making the purchases: the purchases were to be made during the current year: nothing was to be paid by Seymour for Price's services or expenses, except from the profits as aforesaid. The premises in controversy were bought by Price, and the titles vested in Seymour, pursuant to the contract. The property consisted of $2440\frac{22}{100}$ acres of land in the State of Illinois, and several lots in the village of Joliet, in that State.

It was agreed by the parties to this suit, that at the expiration of the five years within which the premises were to be sold, they were unsalable, "and that it is entirely uncertain how much they could have been sold for, or whether they would even have brought enough to pay the original investment and interest."

Before the commencement of the suit the property had become very valuable; 200 acres had been sold for $69,200.

Seymour died in 1837, and Price in 1854. The five years within which the property was to be sold, expired in 1840.

The duties and obligations with which the contract clothed Price, were those of an agent. He was to make the requisite searches and explorations in the States and Territories named, and to receive and invest the money of Seymour as he might deem best for Seymour's interest. He was to contribute his

time, labor, skill, and judgment, but no money except what might be expended in the service he had undertaken to perform. The titles were all to be taken in the name of the principal, who was to advance the money. These functions were performed by Price. His duties and responsibilities thereupon came to an end, and those of Seymour to him commenced. For his expenditures, whatever they might be, he was to receive no immediate or certain return. The same remark is applicable in respect to his labor and services, and the exercise of his skill and judgment. Everything to be done by the agent he was to do, without any charge to his principal.

Seymour was to receive the titles of the property purchased, as if the purchases had been made by himself at home. All the burdens incident to the acquisition of the property were to be borne by Price, with only the contingency of reimbursement and compensation provided in the contract.

The lands were to be sold within five years. It is not stated by whom, but as the legal title was vested in Seymour, the duty of selling, by the clearest implication, devolved upon him. Price had no power to move in the matter, nor to exert any control, except the right to insist that the property should be sold by Seymour, within the time limited, and that the sales should be fairly conducted.* By an implication equally clear, Seymour was to pay all the taxes upon the property which might accrue.

It is proper here to consider the legal and equitable relations of the parties arising out of the contract.

We think Seymour took the legal title in trust for the purposes specified. A trust is where there are rights, titles, and interests in property distinct from the legal ownership. In such cases, the legal title, in the eye of the law, carries with it, to the holder, absolute dominion; but behind it lie beneficial rights and interests in the same property belonging to another. These rights, to the extent to which they exist, are a charge upon the property, and constitute an equity

---

* Mann v. Butler, 2 Barbour's Chancery, 368.

which a court of equity will protect and enforce whenever its aid for that purpose is properly invoked.* Interests in real estate, purely contingent, may be made the subjects of contract and equitable cognizance, as between the proper parties.† The object of the trust here was to sell the property within the time limited, and, after deducting from the proceeds the outlay, with interest and taxes, to pay over to Price one-half of the residue. To this extent, Seymour was a trustee, and Price the *cestui que trust.* They had a joint interest in the property. Seymour held the legal title, but the rights of Price were as valid in equity as those of Seymour were at law.

If Seymour, within the five years, had conveyed the property to one of his children, by way of advancement, or to a stranger, otherwise than upon a *bonâ fide* sale for its fair value, the grantee would have taken the title, subject to the trust upon which Seymour held it, and a court of equity would have followed the property and dealt with it in all respects as if the title had still remained in Seymour. If a valid sale had been made, the trust would have followed and bound the proceeds in like manner as it bound the property.‡

Upon the death of Seymour, the legal estate passed to his devisees.

The principle of equitable conversion has an important bearing upon the case. Equity considers that as done which is agreed to be done. Money which, according to a will or agreement, is to be invested in land, is regarded, in equity, as real estate; and land which is to be converted into money, is regarded as money, and treated accordingly.§ In this view of the subject, the personal representative of Price is the proper person to maintain this suit, and it is not necessary that his heirs-at-law should be parties.

There is another view of the subject, which we think may

---

* 2 Story's Equity, § 964; Sturt *v.* Mellish, 2 Atkyns, 612.

† Phyfe *v.* Wardell et al., 5 Paige, 268; Armour *v.* Alexander, 10 Id. 571.

‡ Oliver *v.* Piatt, 3 Howard, 401; Taylor *v.* Plumer, 3 Maule & Selwyn, 562; Sweet *v.* Jacocks, 6 Paige, 355; Wylie *v.* Coxe, 15 Howard, 416.

§ Anstice's Administrator *v.* Brown et al., 6 Paige, 448.

properly be taken. The agreement, that the property should be sold, and half of the profits paid to Price, was a charge upon the property, and gave him a lien to the extent of the amount to which he should be found entitled upon the execution of the agreement, according to its terms. The principle involved in this proposition, is a familiar one in equity, and constantly applied in the administration of its jurisprudence.*

It is insisted by the appellees that the contract made the parties copartners in respect to the lands to be bought. We cannot adopt that view of the subject. The adjudications which bear upon it are conflicting and irreconcilable. The case of *Berthold et al.* v. *Goldsmith*† is conclusive in this forum against the proposition. We deem it sufficient to refer to that authority, without reproducing the considerations which control the judgment of the court.

But the result is the same as if we held that the parties were copartners. In that event, Seymour would still have held the property as trustee for the firm, according to the rights of the respective members.‡

The appellants contend, that for any violation of the contract to the injury of Price, he had a remedy at law, and that neither he nor his legal representative could have any other.

An action at law, sounding in damages, may, undoubtedly, be maintained in such cases for the breach of an express agreement by the trustee, but this in nowise affects the right to proceed in equity to enforce the trust and lien created by the contract. They are concurrent remedies. Either, which is preferred, may be selected. The remedy in equity is the better one. The right to resort to it, under the circumstances of this case, admits of no doubt, either upon principle or authority. Such, in our judgment, were the effect and consequences of the contract.

---

* Pinch *v.* Anthony and others, 8 Allen, 539; Legard *v.* Hodges, 1 Vesey, Jr. 477; Roundell *v.* Breary, 2 Vernon, 482; Gardner *v.* Townshend, Cooper's Equity Cases, 303; 2 Story's Equity, § 1, 214–16–17; Denston *v.* Morris, 2 Edwards' Chancery, 37.

† 24 Howard, 536.

‡ Anderson *v.* Lemon, 4 Selden, 236.

At the end of the five years, limited for its complete fulfilment, a new element, not anticipated by the parties, and, hence, not provided for, intervened. The property, if then sold, would have afforded no profit. There would have been nothing to divide. It is uncertain whether it would have yielded enough to reimburse the cost and interest. According to the views we have expressed, there was a trust and lien for the benefit of Price. They could be destroyed only by some thing subsequently to occur. Either Price or Seymour's devisees might have insisted upon the sale of the property according to the contract. This would have extinguished the rights of both parties touching the lands, but it would have benefited neither. There would have been no profit for either party. Price would have lost his expenditures of time, money, and skill. The devisees might have lost the interest upon the investment, and, perhaps, a part of the principal.

The devisees might have held the property, and denied that, under the circumstances, the trust subsisted any longer. If Price acquiesced, his rights would have been at an end.

Price might, also, have expressly or tacitly abandoned his claim. This would have worked the same result. Both parties might have concluded to continue their existing relations, and to wait for a more auspicious period for the disposition of the property. Their interests were the same. What would benefit or injure one could not fail to have the same effect upon the others. If the purchases were judiciously made, the course last suggested was obviously the wisest and best for both parties. Was either of the alternatives adopted? and if so, which one?

This is the turning-point of the case.

The burden of the proof as to the two former rests upon the appellants.

Upon a careful examination of the record we have failed to find the slightest proof of any disclaimer by the devisees, or of any renunciation by Price. If such evidence exist we must suppose it is contained in the correspondence between the parties   They are annexed to the bill accounts, showing the

receipts and disbursements of Price down to the time of his death. The receipts, after the death of Seymour, commence on the 24th December, 1841, and terminate on the 16th of June, 1854. All the moneys were received from Messrs. John F. and Horatio Seymour. It appears, by a stipulation in the record, that the sums with which Price debited himself had all been verified by comparing them with the original receipts in the possession of the counsel of the appellants. The Messrs. Seymour lived in the State of New York, and Price at Chicago. The moneys were all remitted by checks. It is apparent, from the face of the accounts, that the receipt of the money, in many instances, if not in all, must have been acknowledged by letter. None of these letters have been produced. Why not? The inference is a fair one, to say the least, that they contain nothing unfavorable to the claim of the appellee. This negative feature of the case is not undeserving of consideration. If Price, neither by expression nor acquiescence, did anything to impair his rights, they must still subsist in full force.

We think there is proof in the record, that he and his personal representative considered the time within which the sales were to be made, prolonged until they could be made profitably, and, that in all other respects, the contract remained as if it had originally contained this modification.

We can hardly conceive how the devisees, who advanced the money to pay the taxes, and with whom Price must have corresponded, could have understood his position differently. It is admitted that from the time of the purchases down to the time of his death, Price had the care and charge of the property, and paid the taxes upon it, the devisees furnishing the money. His accounts are long, and the items numerous. There is no proof that he ever made any charge, or claimed anything for his services. His accounts are silent upon the subject. How can this be accounted for, unless he expected to be compensated by his share of the profits of the lands, to be realized when the proper time for selling should arrive?

Upon his death, High, his administrator, succeeded to the

agency. He was employed by the devisees, and performed the same duties as his predecessor. He negotiated the sales mentioned in the bill, and at once claimed a share of the profits for Price's estate, according to the contract. The claim was resisted by the devisees, and he thereupon instituted this suit.

The theory insisted upon by the appellees is consistent with all the evidence in the case. It is in conflict with nothing which has been developed. It is alleged, in one of the answers, that Price "never pretended to the defendants to have any interest, . . . but claimed that he ought to be allowed a reasonable compensation for his services as agent, and not under the contract." When, where, and how was the claim made? If by letter, why is not the letter produced? The fact is important, but the allegation is wholly unsupported by anything in the record.

The answers set up the bar of the statute of limitations. Where there is no disclaimer the statute has no application to an express trust, such as we have found to exist in this case.

It is said there is a misjoinder of parties in the bill with respect to the executors of Seymour. The doctrine of equitable conversion renders their presence in the case necessary, if not indispensable. If the objection were well taken, the bill as to them would be dismissed. The error would have no other effect.

It is alleged, also, that there is a defect of non-joinder as to the heirs-at-law of Price. The application of the same doctrine is a sufficient answer to this objection.

Conceding that the appellee is entitled to have the contract specifically executed, the appellants insist that the court below erred in decreeing that it should be done by a receiver instead of themselves. There being a trust and a lien a court of equity had unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties. The devisees are numerous. The

death of any one of them might seriously retard and embarrass the execution of a decree shaped as the appellants suggest. The appointment of the solicitor of the appellants as receiver, and the stipulation, which appears in the record, that he might sell at private sale, protects in the best manner the interests of all concerned.

The court below held that the contract made the parties to it copartners, and the decree was framed accordingly. But, as the provisions of the decree conform in all respects to our views, this theoretical error constitutes no ground of reversal. A wrong reason was given for what was properly done.

The litigation appears to have been conducted in a spirit of candor and fairness on both sides, which is eminently creditable to the parties.

We find no error in the record, and the decree of the Circuit Court is.                                    AFFIRMED.

Mr. Justice FIELD delivered the following dissenting opinion.

Mr. Justice NELSON, Mr. Justice GRIER, and myself dissent from the judgment of a majority of the court in this case.

The decrees appealed from are founded upon the theory that, by the agreement of May, 1835, Price and Seymour became copartners, and that the property purchased was copartnership property. The interlocutory decree declares that Price, by virtue of that agreement, "was entitled, as an equal copartner in the property, to one equal half of the profits made, or to be made, from the sale of the lands;" that the lands were purchased by Price as an "investment on joint account of himself and said Seymour," and that the sales made, and to be made, were "to be deemed and taken as made, and to be made, on joint account." And in the final decree the court administers the property on what it declares to be "just partnership principles." It provides for the payment out of the fund of all the costs and ex-

penses, and *that* " the balance which shall remain [of the funds then on hand], being clear profits of the *partnership* land purchase and sale up to the present time, be equally divided." And it speaks of " closing and settling the partnership land accounts, so far as the sales and collections have progressed."

And the case was presented to this court both in the oral and printed arguments of counsel upon the question whether a copartnership was created between Price and Seymour by the agreement of 1835, or any interest vested in Price in the lands purchased.

We shall consider at some length both parts of this question, and in disposing of them, we shall dispose, in our judgment, of the entire merits of the case.

We do not consider the agreement as creating any partnership between the parties, or as vesting in Price any interest, legal or equitable, in the lands purchased. It provides simply for services to be rendered by Price for Seymour, and a contingent compensation to be made to him for such services. It stipulates on the part of Price, that he shall devote his time and best judgment to the selection and purchase of land to an amount not exceeding five thousand dollars, in certain designated States and Territories, or in such of them as he may find most advantageous to the interest of Seymour; that the purchases shall be made during the then existing year, and that the contracts of purchase shall be made and the conveyances taken in the name of Seymour; and on the part of Seymour, that he shall furnish the five thousand dollars, that the lands purchased shall be sold within five years afterwards, and that of the profits made by *such* purchase and sale, one-half shall be paid to Price, and be in full for his services and expenses. And as if to prevent any possible misconstruction, the agreement closes with a declaration that no payment for those services or expenses shall be made except from such profits.

By the express terms of the agreement the ownership of the property was to be in Seymour; the lands were to be selected and purchased for his general interest, and the title

was to be taken in his name.   The special interest of Price was only in the profits as a means of compensation for his services; and the interest was not in profits which might be made at any time, upon any future sale, however remote, but upon a sale within five years.   He was to receive for his compensation one-half that might be realized above cost, interest, and taxes, from the rise of the property within that period..   If language is to be interpreted in its natural and ordinary sense, the contract means that, and means nothing more nor less.   The purchases, it says, shall be made during the present year.   The sale shall be made within five years from that time, and one-half the profits from *such* purchase and sale, not from purchases or sales made at any other time, shall be paid to Price, not as profits, but as compensation for his services.

The provision for the sale in five years was not merely directory and modal, which might be waived by Price without affecting his rights.   The subsequent clauses securing a compensation to him are limited to a sale within the period designated.   He was to have half of the profits arising upon *such* sale; the moiety of the profits made upon such sale was to be in *full* for his compensation, and he was not to receive anything for services or expenses, except a participation in the profits made " *as aforesaid.*"

To one who is familiar with the history of the growth of the West, there is nothing singular or even unusual in a contract of this kind.   With the immense tide of immigration setting in that direction, lands of comparatively little value one day sometimes in a few months become the sites of villages and cities, and the source of affluence to their possessors.   It is not strange, therefore, that in 1835, a year somewhat noted for its speculative tendencies, a gentleman of capital should propose to one of energy and experience in such matters, that he advance the money, and the latter invest it in lands in the States and Territories of the West, "on or near the sites, or expected sites, of towns or places of business," upon a consideration that the latter should receive by way of compensation one-half of the profits which might

be made from the rise of the property in value within a designated period.

Nor is there anything in contracts of this character which imposes the obligations or confers the rights of copartners between the parties. There is no copartnership where the relationship between the parties is that of master and servant, or of employer and employee, though the compensation of the latter may be in proportion to the profits, or be paid entirely out of them. Under some circumstances parties thus receiving a portion of the profits may be held, as respects third persons, subject to the liabilities of partners; but as between themselves, and in the adjustment of their respective rights, no such relation obtains. This has been settled law for more than half a century. Thus, in *Hesketh* v. *Blanchard*,* decided in 1803, the plaintiff had furnished goods purchased by him on credit, to one Robinson, the testator of the defendants, to take to Africa for purposes of trade, upon an agreement that if any profit should arise from the adventure, he should have one-half for his trouble. The plaintiff having paid for the goods, brought an action for the amount. It was objected in defence, that as the parties were to divide the profits, if any, they must be equally liable for any loss, and that, therefore, a partnership was constituted between them. But the objection was not sustained, and Lord Ellenborough said that "Quoad third parties it [the agreement] was a partnership, for the plaintiff was to share half the profits; but as between themselves, it was only an agreement for so much as a compensation for the plaintiff's trouble, and for lending Robinson his credit."

In *Hazard* v. *Hazard*,† this doctrine was applied to a case where one of two parties agreed to devote his time to the management of the concerns of factories belonging to the other party, for one-fourth of the profits of the business for the first year, and one-third of the profits for each year after until the expiration of the agreement, which portion of the profits was to be the sole reward for his services. It was held that there was no partnership between the parties. "A mere

---

* 4 East, 144.          † 1 Story, 371.

participation in the profits," said Mr. Justice Story, "will not render the parties partners *inter sese*, whatever it may do as to third persons, unless they so intend it. If A. agrees to give B. one-third of the profits of a particular transaction or business for his labor and services therein, that may make both liable to third persons as partners, but not as between themselves;" and he refers in support of the doctrine to the case already cited of *Hesketh* v. *Blanchard.*

Similar adjudications have been repeatedly made, we believe, in the highest courts of every State in the Union. Some slight differences exist in them as to the extent in which a participation in the profits of a business, by way of compensation, will render a party liable as a partner to third persons; but there is entire concurrence in the conclusion that such participation alone does not create a partnership between the parties.

In *Denny* v. *Cabot and others,** the question presented to the Supreme Court of Massachusetts was, whether the defendant Cooper was a partner with Cabot, Appleton & Co. The agreement between them was substantially this: Cabot, Appleton & Co. were to furnish Cooper stock to be manufactured into cloth at his mill on their account, and Cooper was to manufacture the cloth and deliver it to them, and was to receive from them a stipulated sum per yard, and one-third part of the net profits of the business. It was held that the parties were not partners, either between themselves or as to third persons; that the agreement only provided the manner in which the compensation to Cooper for his services in manufacturing the cloth was to be ascertained, and that he had no title to any share of the cloth or any lien thereon.

In *Loomis* v. *Marshall,*† a case, in some respects, similar to that of *Denny* v. *Cabot*, was before the Supreme Court of Connecticut, and the liability of a party who receives a portion of the profits of a business as compensation for his services was very elaborately and ably considered. The agreement in the case was substantially this: A. was to furnish B., who occupied a factory, a supply of wool for two years,

---

* 6 Metcalf, 83.          † 12 Connecticut, 69.

to be manufactured into cloths.  B. agreed to manufacture
the cloths, and to devote the use of the factory to that pur-
pose, and the net proceeds of the cloths, after deducting in-
cidental expenses and charges of sale, were to be divided so
that A. should have fifty-five per cent. and B. forty-five per
cent.  The cost of the warp used, and the expense of in-
surance on the wool or cloths, were to be borne by them in
the same ratio, and in case of destruction of wool or cloth
by fire, the amount received from the insurance was to be
divided between them, according to the loss of each.  It was
held that the agreement did not create a partnership between
the parties; that the case was properly referable to that class
of cases in which one party receives a share of the profits or
avails as a compensation for services rendered, labor per-
formed, and expenses incurred in the business; and the court
observed, that if it should hold that the agreement constituted
a partnership, it would change the existing law as to factors,
brokers, agents, shipmasters, and seamen, who share in the
profits by way of compensation, or in lieu of wages, and
introduce great perplexity in the adjustment of their legal
rights and remedies.

Now, if a party does not become a partner with others in
business, general or special, as is above clearly established
by the authorities, from the fact that by way of compensation
he participates with them in the profits of the business, it
follows that he does not, by reason of such participation, ac-
quire any interest, legal or equitable, in the property which
constitutes the basis of the business.  It is only upon the
theory that the services rendered by one party are to be con-
sidered as an equivalent to the capital advanced by the other,
that a common interest of both in the property can be asserted.
This theory, not resting upon any solid foundation, the in-
ference deduced therefrom, of course, fails.  The sharing of
the profits not changing the relation of the party as agent to
the one who furnishes the capital, the ownership of the prop-
erty acquired by such capital is not affected.  The case of
*Smith* v. *Watson** is conclusive upon this point.  In that case,

---

* 2 Barnewall & Cresswell, 401.

one Sampson (whose assignees in bankruptcy were the plaintiffs) employed one Gill, a broker, to purchase whalebone, and, by agreement, was to pay him one-third of the profits made on the sale of it for his trouble.    The defendants were bankers, with whom Sampson kept his account; and the suit was brought to recover an amount in the defendant's hands, which was the proceeds of a bill drawn by Sampson on account of a parcel of whalebone which he had sold.    Gill claiming to be a partner of Sampson, by means of the agreement, indemnified the bankers and received the money.    It was held that the plaintiffs, as assignees of Sampson, were entitled to recover.    Bayley, J., said:

"A right to share in the profits of a particular adventure may have the effect of rendering a person liable to third persons as a partner in respect of transactions arising out of the particular adventure, in the profits of which he is to participate; but it does not give him any interest in the property itself which was the subject-matter of the adventure.    Gill's right to claim property in the whalebone must arise out of the terms of the bargain with Sampson; and looking to them, it appears clearly that it was not joint property.    It may be assumed that it was purchased in the name of Sampson only, for Gill was a mere agent, and was to have a proportion of the profits in lieu of brokerage. Considering the question in this view, I am clearly of opinion that Gill had no property in the whalebone, or in the proceeds of the bill."

Holroyd, J., said:

"Assuming it to have been agreed between Sampson and Gill that the latter should make purchases of whalebone, and in lieu of brokerage, should have one-third of the profits arising out of the sales, and that he should even bear a certain proportion of the losses, I am of opinion that although such an agreement might make Gill liable as a partner to third persons, yet that it did not vest in him any interest in the whalebone purchased with the money of Sampson.    Such an agreement would not convert that which was obtained by the separate property of Sampson into the joint property of Sampson and Gill.    It may be collected from the evidence, that the latter did not furnish any part of the money required to pay for the whalebone, and that the contracts

for sale were made not in his name, but in that of Sampson, for Gill was to act as a broker only, and to receive a share of the profits in lieu of his brokerage. The money paid for the whalebone being, therefore, Sampson's separate property, and the contracts being made in his name as the purchaser, the property in the thing purchased would vest, by virtue of the contracts, in him alone."

There is no difference in principle between this case and the one under consideration. Price was employed to purchase land, and Gill was employed to purchase whalebone. Price was to receive one-half of the profits made upon a sale of the land for his services and expenses, and Gill was to receive one-third of the profits on the sale of the whalebone for his trouble. Gill was held not to be a partner with Sampson who employed him, or to have any joint interest with him in the whalebone; and upon the same principle it should be held, in our judgment, that Price was not a partner with Seymour, and did not possess any joint interest with him, in the land purchased.

If the decision in the case of *Smith* v. *Watson* is sound law, and it has not, that we are aware of, ever been questioned, but, on the contrary, has been uniformly approved by the highest courts of England and of the United States, it is impossible for the complainants to sustain the present suit. The suit proceeds and the decree is rendered, as we have here already stated, upon the theory that Price and Seymour were copartners, and that the property purchased was copartnership property.

We have shown, as we think conclusively, that Price was not a copartner with Seymour under the contract between them, and that he did not possess any interest with him in the lands purchased, but that the lands constituted the separate property of Seymour. Price was, it is true, interested in the profits to be made in the sale of the land, according to the terms of the agreement. It was not, however, the interest of a partner, but the interest which every party to an executory contract has in having the stipulations in his favor

performed by the other party. A personal action against the delinquent party, or his personal representatives, is the remedy for the breach of an agreement of this character. Resort can be had to equity only when special circumstances intervene to render the action at law unavailable. Undoubtedly Price could have maintained an action at law against the representatives of Seymour had a sale of the property been refused within the five years specified in the agreement, and recovered, as damages, a sum equal to one-half the difference between the value of the property and the amount of its cost, interest thereon, and expenses. That he did not institute any such action, or make any claim upon them, is explained by the admission accompanying the record, that the property was at that time unsalable, and that it was uncertain whether, if a sale could have been made, it would have brought enough to repay the original investment and interest. The subsequent conduct of Price shows very clearly that he regarded his right to compensation dependent upon the possibility of effecting a sale at a profit at that time. He lived until July, 1854, more than fourteen years after the expiration of the five years, and he never asserted any claim under the contract. He never requested that the lands be sold, or asserted any interest in them or their proceeds. He uniformly treated the contract as at an end, and the heirs of Seymour as the exclusive owners of the land and its proceeds. He subsequently acted as agent for them in paying taxes upon the property. He lived near the property, and it was natural that he should be employed for that purpose. But if funds, even of trifling amounts, were not forwarded to him, he did not advance the money, but allowed the property to be sold. It is difficult to reconcile this conduct with the theory that he considered himself at the time as having a claim either upon the land or its proceeds. And it is still more difficult to account for his entire silence to all the world, to his own relatives and agents, as well as to the heirs of Seymour, respecting any claim upon the property or its proceeds, if he considered that in fact he possessed any. It remained for the administrator of his

estate, nearly three years after his death, to discover that he possessed, during his life, unknown to himself, large and valuable interests in property which he had purchased for others, and in their name, twenty-two years before. The claim now asserted is contrary to the express terms of the contract, and the construction given to it by Price himself. And even the administrator acted as agent for the heirs in paying taxes upon the property and in negotiating sales for them until he made the discovery of the supposed rights of his intestate.

It is urged as an objection to the case made by the defendants that they did not produce the letters of Price to them. It is assumed without any intimation to that effect on the part of the complainant, that these letters might have contained, and not being produced, must be presumed to have contained something against the interests of the defendants. The objection may be answered by the suggestion that the complainant did not produce the letters of the heirs of Seymour to Price. If they had contained any recognition of the claim now asserted on behalf of Price's estate, there can be no doubt that they would have been brought forth. If it be proper to invoke presumptions in respect to the contents of papers not produced, even when not called for, the presumption against the claim of the complainant must be regarded as very great. It is highly improbable that no allusion would be made by the heirs of Seymour to the interest of Price in the property, or to his claiming an interest, during a correspondence of fourteen years, if, in truth, he possessed or claimed any.

The case of *Stow* v. *Robinson*,\* decided by the Supreme Court of Illinois, presents similar features to the one under consideration, and is authority upon the point, that the remedy of Price, if a sale within the five years had been refused, was at law, for breach of the contract, and not in equity. The case was this: Robinson was the owner of a block of land in or near Chicago, and it was agreed between

\* 24 Illinois, 532.

him and one Rathway that the block should be subdivided, and that Rathway should dispose of the lots for one-fourth cash, the remainder to be secured by notes payable in one, two, and three years, with interest, Robinson to give bonds for deeds on receiving the notes, and to execute conveyances when the notes were paid. Out of the proceeds obtained Robinson was to receive the purchase-money of the block, with interest, and the balance was to be equally divided between the parties; and for his share upon this division Rathway was to plat, survey, or subdivide the block, and advertise and sell the same at his own expense. Rathway, under the agreement, subdivided the block into lots, and sold a portion of them, when Robinson stopped the sale, and refused to allow any further sale, or to execute any more title-papers. Rathway having died, his heirs and personal representatives filed their bill to compel a performance of the agreement. The court held that by the agreement Rathway did not acquire any vested interest in the land itself, and if he was prevented from executing his part of the agreement, he had his remedy by an action at law for damages, and that his remedy was clearly not in equity.

The difference between this case and the one under consideration is circumstantial; the principle is the same in both. The services rendered in each were the meritorious cause for the compensation to be made by the owner of the land. In the case cited it was the platting, surveying, subdividing, advertising, and selling the land; in the case at bar it was the selection and purchase of the land. The difference in the services is not material. The contract stipulating for the services in the case cited created in Rathway no interest in the land held by Robinson; and for the same reason the contract in the case at bar, in our judgment, created in Price no interest in the land held by Seymour. If Price possessed no such interest, there can be no pretence that the land was subject to any trust for his benefit.

In our judgment the decree below should be reversed and the bill dismissed.