BLAIR *v.* SHAEFFER and others.

(*Circuit Court, W. D. Missouri, W. D.* 1887.)

1. PARTNERSHIP—WHAT CONSTITUTES—CONTRACT.
    On February 24, 1884, the parties entered into a contract whereby the plaintiff was to furnish the money, and the defendant was to obtain the title to the property in his own name, and manage it for a fixed compensation of 5 per cent. commission on sales, for their mutual benefit. In regard to the profits the contract further provided that when enough land had been sold to repay the plaintiff all the money he had advanced, with interest, then the remainder of the property should belong, 60 per cent. to the plaintiff, and 40 per cent. to the defendant, or if the remainder of the property was converted into money, then the proceeds should belong, 60 per cent. to the plaintiff, and 40 per cent. to the defendant. *Held,* that the contract did not create a partnership between the parties.[1]

2. ESTOPPEL—CONTRACT TO CONVEY—DEFECTIVE TITLE.
    A contract between the plaintiff and his agent, the defendant, provided that within four months after said agent shall have obtained the title to said lands, or sooner if desired by the plaintiff, said agent shall make a warranty deed to said plaintiff for said lands. The agent claimed that he had not secured a perfect title, and refused to convey. The plaintiff was willing to take the title the agent had. *Held,* that it did not lie in the agent's mouth to allege a defect in the title.

---

[1] Merely sharing in profits, where third parties have not been legitimately led to believe in the existence of a partnership, does not create a partnership as to them, unless there was one in fact. Colwell v. Britten, (Mich.) 26 N. W. Rep. 538; Clark v. Barnes, (Iowa,) 34 N. W. Rep. 419. A mere participation in the profits and losses of a business does not necessarily constitute a partnership. Clifton v. Howard, (Mo.) 1 S. W. Rep. 29, and note.

3. PRINCIPAL AND AGENT—FRAUD OF AGENT—FORFEITURE OF RIGHTS.

By his own admissions it appeared that the defendant, who was the agent of the plaintiff to buy certain property for the plaintiff, charged and received from the plaintiff $21,336.70 more than he paid for the property. *Held*, that it was a clear case of gross misconduct; and that defendant had forfeited all the interest and rights given him by his contract with plaintiff.

*C. O. Tichenor, Johnson & Lucas*, and *W. H. Wallace*, for complainant.
*Karnes & Krauthoff* and *W. W. Beebe*, for defendant.

BREWER, J. This bill was filed to compel the execution of a deed, and for a decree adjudging that defendant has no interest in the land, and enjoining him from interfering therein. The facts are these: On February 4, 1884, the parties, complainant and defendant, entered into this contract:

"Whereas, by virtue of a certain contract made by Samuel C. Shaeffer, of Lancaster, Ohio, with P. Cardenas, of New York city, for the purchase of thirty-six 47-100 (36 47-100) acres of land in Jackson county, Missouri, and known as lot 7, of the partition of the estate of Thomas West, deceased, by the circuit court of Jackson county, Missouri, on October 18, 1880, as per contract dated the first day of November, 1883, for which said land the said Shaeffer was to pay the said Cardenas the sum of twenty-one thousand eight hundred and eighty-two ($21,882) dollars, on or before the eighth day of February, 1884. Now it is agreed, as said contract is made by said Shaeffer for said land, and for prudential purposes, that the same shall be conveyed by warranty deed to said Shaeffer, and that John I. Blair, of Blairstown, N. J., has paid for the same by giving to said Shaeffer a check on the National Park Bank of New York City, for the sum of twenty-one thousand eight hundred and eighty-two ($21,882) dollars, signed by the president of the Belvidere National Bank of New Jersey, to enable him to pay for the said land.

"And whereas, by another agreement made by said Shaeffer with Marian West, of Jackson county, Missouri, dated July 24, 1882, and October 21, 1882, whereby said Marian West sold the interests of Frank West, Thomas West, and Joseph C. West, minor heirs of Thomas West, deceased, and known as lots five, (5,) six, (6,) and eight (8) of the partition of the estate of Thomas West, deceased, by the circuit court of Jackson county, Missouri, on October 18, 1880, for which said land, by said contract, said Shaeffer was to pay the sum of forty-four thousand five hundred and fifty-nine (44,559) dollars, ten thousand to be paid in cash upon the delivery of the deed, and the remainder, ($34,559,) to-wit, ($17,279 50-100,) on or before the eighth day of February, 1885, and ($17,279 50-100) on or before the first day of February, 1886, bearing 8 per cent. interest from February 1, 1883, and secured by a mortgage on said premises: the said John I. Blair has given to said Shaeffer a check, signed by the president of the Belvidere National Bank of New Jersey on the National Park Bank of New York City, for ten thousand (10,000) dollars, to enable said Shaeffer to pay that much on account of said lands, and for prudential reasons to obtain a deed for the same in his own name. The said Blair is to pay the balance of the purchase money at maturity, amounting to $34,559, given by said Shaeffer, and secured by mortgage. This makes at this time the cash payments on the above two contracts, ($21,882 and $10,-000, making $31,882,) which is to bear eight per cent. interest until paid out of the sales of the lands as aforesaid. The interest to be added to the principal yearly, and bear eight per cent. interest until paid. Within four months after said Shaeffer shall have obtained the title to said lands, or sooner if desired by said Blair, said Shaeffer to make a warranty deed to said Blair for

said lands. Now, it is further agreed, for the mutual interest of said Blair and Shaeffer, it may be deemed advisable to obtain certain releases for pretended claims made by the Anthony heirs to said property, the sum for said purpose to be mutually agreed upon, which sum said Blair agrees to furnish to said Shaeffer upon telegraph notice, to aid him in securing said releases, and Shaeffer afterwards to deed by release deed said lands to said Blair, said money to bear the same rate of interest and governed by the same conditions, as herinbefore stipulated, the same to be indorsed on this contract or other written evidence given that said Blair paid the money.

"It is deemed for the mutual benefit of said Blair and Shaeffer that Shaeffer purchase the 69 acres of land from John S. West adjoining the above-described lands, at a price not to exceed $400 per acre, amounting to twenty-seven thousand six hundred ($27,600) dollars, and to obtain a warranty deed therefor.

"Said John I. Blair has given said Shaeffer the president's check of the Belvidere National Bank of New Jersey, on the National Park Bank of New York City, for fourteen thousand and six hundred dollars, ($14,600,) as part-payment for said sixty-nine acres of land. If said property cannot be purchased for twenty-seven thousand six hundred ($27,600) dollars, then said ($14,600) check to be returned to said Blair unused. Said Blair agrees to assume and pay ($13,000) mortgages on said property, which said Shaeffer will give to said West, payable in one or two years, and bearing eight per cent. interest, in case said purchase can be made. Said Shaeffer, within four months after obtaining title to said land, to deed same to said Blair, all the money paid or furnished, and assumed to pay for said land, by said Blair, to bear eight per cent. interest, and added to the principal each year until paid. All money necessary to stake off lots, grade streets, advertising, office furniture, fixtures, and rent, and stationery, taxes, and such other expenses as may become necessary for the improvement and sale of said property, or may be mutually agreed upon from time to time by said Blair and Shaeffer, shall be furnished by said Blair. Said Shaeffer is to receive and deduct 5 per cent. commission upon gross sales of all lots sold at the agreed price or over, made by said Blair and Shaeffer, and the remainder to be deposited, in some bank in Kansas City that may be mutually agreed upon, to the credit of John I. Blair, until all the money he has paid or advanced, with interest as aforesaid, shall have been returned to him. At the end of each month said Shaeffer to report the amount to credit of said Blair, the same to be subject to said Blair's draft on account of money advanced or paid for the property and otherwise as aforesaid. All contracts for the sales of the said lands or lots to be made in triplicate, and approved by said John I. Blair, or some one appointed by him, on the back of said contract. The word 'approved' or 'rejected' to be written or signed by said John I. Blair, as aforesaid; one copy of said contract to be retained by said Shaeffer, and one by the purchaser. It shall be specified on the face of said contracts that said contracts shall not be valid unless approved as specified, and all contracts to be made payable to said John I. Blair.

"When said Blair shall have been paid in cash for all the money advanced and furnished by him for the purchase of said land, and other moneys, and the interest thereon as specified, then the remainder of the property shall belong, sixty (60) per cent. to said Blair, and forty (40) per cent. to said Shaeffer; and then said Shaeffer shall not be required to deposit in the aforesaid bank, as aforesaid specified, to the credit of said Blair, more than sixty per cent. of the net proceeds of sales of said lands or lots.

"If it is at that time desirable to divide said lots or lands between said Blair and Shaeffer, said Blair to take sixty per cent., and said Blair to convey the title to forty per cent. of said property or lots by warranty deeds to said Shaeffer, or said Shaeffer to sell the lots or lands as aforesaid, and divide the net proceeds of sales, sixty per cent. to said Blair, and forty per cent. to

said Shaeffer. It is understood that said property or any portion thereof, to be staked out and prepared for sale within one year by said Shaeffer, or assigns, after the Kansas City Belt Line Railway shall have been completed to said property, unless otherwise postponed in writing by said Blair and Shaeffer.

"In witness whereof the parties hereto have hereunto set their hands and seals on this fourth day of February, 1884, at Kansas City, Mo."

In pursuance of this contract, and during the same month, defendant obtained title to the lands specified therein. Demand for a conveyance was made and refused. The first question arises on the construction of this contract. Complainant insists that he is the absolute owner of these lands, and that defendant by the contract took no interest in them, but was simply employed as an agent to sell, with a fixed commission, and a share in the net profits, as compensation for his services. Defendant claims that by it a partnership was formed, complainant putting in his money against defendant's time and services, and that the title was to be conveyed to complainant simply as security for the moneys that had been advanced. This question is pivotal, for if defendant's construction is correct, complainant is certainly not entitled to the relief he asks.

What constitutes a partnership? What tests can be applied which shall determine with certainty whether a given contract has given creation to a partnership? These questions have been often asked. It is enough to say that no tests have yet been found which determine with absolute and unerring certainty the question of partnership. There are no third parties in this case, and the question arises directly between the parties to the contract. It were useless to review the authorities from other states; it will be enough to consider what the supreme court of this state and the supreme court of the United States have said on the matter. A sharing in the profits is *prima facie* evidence of a partnership, but is by no means conclusive. In *Donnell* v. *Harshe*, 67 Mo. 172, the court uses this language:

"It is essential to a partnership that there be a community of interest in the substance of it, and this community of interest must not be that of mere joint tenants or tenants in common."

—And also quotes approvingly the opinion of Chief Justice SHEPLEY in *Dwinel* v. *Stone*, 30 Me. 384, as follows:

"There must be such a community of interests as empowers each party to make contracts, incur liabilities, manage the whole business, and dispose of the whole property; a right which, upon the dissolution of the partnership by death of one, passes to the survivor, and not to the representatives of the deceased."

This decision was reaffirmed in *Ashby* v. *Shaw*, 82 Mo. 76, and also in *McDonald* v. *Matney*, Id. 358, in which case the court uses this language:

"It is a question of intention on the part of the alleged partners, and is one which the triers of fact will have to determine upon all the circumstances proved; it would be difficult to state any one fact or stipulation which would be decisive of the question, except a stipulation expressed that they were part-

ners *inter sese;* and even this might be controlled by other stipulations, and the conduct of the parties in relation to the business. Each case must be determined upon its own peculiar facts."

*Beauregard* v. *Case*, 99 U. S. 119, is cited by the defendant as in point, but there is a very clear distinction between that case and this. It is true in that, as in this, that one party was to furnish the money, and the other to obtain the title to the property in his own name, and manage it for a fixed compensation for their mutual benefit; but in that, the contract expressly provided that the parties should share in both the gains and losses, and also named the relationship a partnership, and provided for a continuance thereof in case of the death of one of the parties. The intention of the parties was thus clearly expressed. Beyond that, the supreme court seems to have rested its decision, partly at least, upon the language of article 2811, Civil Code La. 1870. The case of *Seymour* v. *Freer*, 8 Wall. 202, is also cited, and I think that case very much in point; but all the members of the supreme court united in declaring that the contract there presented did not create a partnership. That contract provided that one party should furnish money, and the other invest it in land, the profits to be divided. It is true that the contract in terms expressed that the party receiving the money, and rendering services in the purchase of the land, was to receive one-half of the profits "in full for his services and expenses of every kind;" but it is also true that the part to be performed by each party, the relations actually created between them by the contracts, are the same in this case as in that. Here, the one party was to furnish all the money, the other was to do all the work; so was it in that case. There, the party furnishing the money was to take the title—so here; there, he was to be reimbursed his money and interest—so here; there, the party doing the work was to receive a compensation out of the net profits—so here; though the defendant here, in addition, was to receive a fixed commission on all sales made. It is true that in that case the services were to be rendered in buying land, here in selling; but that is immaterial. Looking at the substance of the contract, that case would seem to be decisive of this, and to compel the conclusion that no partnership relation was created between the parties by this contract.

Turning now to the contract, I notice these matters as supporting this conclusion: *First.* The title to the land is to be vested in complainant; —true, temporarily, for prudential reasons, it was to be taken in the name of defendant, but within four months, or sooner if complainant desired, it was to be vested in him alone, and not in any partnership. *Second.* Defendant was to receive 5 per cent. commission upon sales;— language apt to describe the compensation of an agent, and not a provision to be expected as between partners. *Third.* The power of sale was not vested in defendant; none could be made by him without complainant's approval; while, on the other hand, no limitation is placed upon complainant's power of sale;—just such an arrangement as might be expected between principal and agent, the only limitation in such cases deemed necessary being upon the acts and authority of the agent.

Surely this does not disclose such a community of interest as authorizes each party to make contracts, incur liabilities, manage the whole business, and dispose of the whole property. *Fourth.* It is provided in the contract that when complainant shall be reimbursed his money and interest, "then the remainder of the property shall belong, 60% to said Blair, and 40% to said Shaeffer." This implies, not that the property belonged theretofore equally to each, but that it belonged to complainant alone, and was a provision for the division of the net profits. It matters not that the profits remained in land, for the interest then to be vested in defendant in the lands was an interest in them simply as profits. *Fifth.* It is provided that the property shall be "staked out and prepared for sale within one year by said Shaeffer, or assigns." A partnership contemplates no assignment by one party, and the use of that word tends to support the conclusion that no partnership was intended. These special matters all unite in disclosing the intent of the parties; an intent not to create a partnership, but the relation of principal and agent. It is true, as urged by counsel for defendant, that in one place is found this expression: "It is further agreed for the mutual interest of said Blair and Shaeffer;" but this is perfectly consistent with the non-existence of a partnership, for Shaeffer was interested, by reason of his share in the profits, as well as Blair, in anything which increased the value of the land or tended to facilitate sales. Of course, the written contract expressed the obligation and relations of these parties, and it is unnecessary to examine either the oral or written communications between them prior thereto; their only value would be to throw light on any question of the doubtful intent of language used in the contract; and yet, if we examine those prior communications, the general import of them seems to me to be this: that Shaeffer was seeking to induce the complainant to buy land, and obtain the agency for the sale, coupled with an option to purchase. My conclusion, then, is that no partnership was formed by this contract, and that the rights of the parties are not to be determined by the laws of partnership. The contract provides in terms that "within four months after said Shaeffer shall have obtained the title to said lands, or sooner if desired by said Blair, said Shaeffer to make a warranty deed to said Blair for said lands." Shaeffer has failed to do this on demand, and Blair insists now upon the specific performance of this covenant.

It is objected on defendant's part that perfect title has not been obtained; that there still remains an unremoved cloud; and that this covenant should be read "within four months, or sooner, after the acquisition of perfect title." I do not so understand the covenant. The title referred to therein is the title previously specified in the contract. That title was obtained before the expiration of the month in which the contract was signed. Shaeffer, in his letters written during that month, says: "Have now perfect title;" and, again: "I will record Wednesday morning eleven deeds, and the title will be perfect." Blair is content to take the title which Shaeffer has, and it does not lie in Shaeffer's mouth to now allege a defect. But it is further objected that equity will never single out a single covenant from a contract, and enforce that, when noth-

ing substantial is accomplished thereby, and that Blair's interests are fully protected by the recording of this contract.

This brings me now to consider what rights Shaeffer had under this contract. Evidently he had the right of an agent to sell, with a share of the profits as compensation; and this right amounted to an interest in the land. Such was the conclusion of a majority of the supreme court in the case of *Seymour* v. *Freer, supra.* Defendant now insists that complainant must be restricted to the allegations in his bill, which are that, by said contract, "said Shaeffer was to convey the said lands so purchased to complainant, and *was in no event to have any interest in said lands,* but was simply to hold them in trust for the complainant until he desired the legal title." If that were all there is in the bill, there might be force in the objection of the defendant; at least an amendment of the bill might be necessary; but the bill goes on further, and alleges gross misconduct on the part of Shaeffer in the purchase of these lands, and that brings up these questions: What misconduct, if any, is shown on the part of Shaeffer? And what misconduct on the part of an agent will forfeit his right to commissions and compensations? Answering the last question first, I quote the rule as laid down in Story, Ag. § 311:

"In the next place, the agent is entitled to his commissions only upon a due and faithful performance of all the duties of his agency in regard to his principal. * * * If, therefore, the agent does not perform his appropriate duties, or if he is guilty of gross negligence, or gross misconduct, or gross unskillfulness in the business of his agency, he will not only become liable to his principal for any damages which he may sustain thereby, but he will also forfeit all his commissions. Slight negligence, or slight omissions of duty, will not, indeed, ordinarily, be visited with such serious consequences, although, if any loss has occurred thereby to the principal, it will be followed by a proportionate diminution of the commissions."

See, also, *Sumner* v. *Reicheniker*, 9 Kan. 322; *Porter* v. *Silvers*, 35 Ind. 296. See, also, the case of *Denver* v. *Roane*, 99 U. S. 355, as to the effect of misconduct on the part of a partner upon his right to share in compensation.

Passing now to the first question, I have before me an enormous volume of testimony, much of it wholly irrelevant, or at most tending to show nothing more than the feeling which exists between the parties, and the circumstances which led to their estrangement. Coming now to the matters which are pertinent, it appears that the contract contemplated four transactions: *First,* the purchase of the Cardenas tract; *second,* the purchase of the tracts belonging to the West minors; *third,* the purchase of the John S. West tract; and, *fourth,* the obtaining of certain releases from the Anthony heirs. All these transactions were carried through by defendant, except obtaining the release from one of the Anthony heirs, and the claim of complainant is that defendant in each of these transactions deliberately defrauded him out of a large amount of money. He claims, further, that defendant, without his knowledge and consent, sold a portion of the land to the Missouri Pacific Railway Company, receiving $1,310 therefor; that he also received from the Belt Railway Company $4,200; both of which sums he has appropriated to him-

self, and failed to deposit or pay over as required by the contract. Also that he conveyed to one Frederick Lamb a small portion of the land, taking back a trust deed therefor for his own use and benefit, contrary to the provisions of the contract. Also that he conveyed the entire property to one Ernesto Dalte.

I shall consider these matters in the reverse order, beginning at the last, and shall generally without noticing the testimony in detail, simply state my conclusions.

*First.* So far as the Dalte matter is concerned, it amounts to nothing. The conveyance was made after this contract had been placed of record, and does not purport to be anything more than a conveyance of defendant's interest, subject to that contract. The reasons given for the conveyance seem to be satisfactory.

*Second.* It appears that, shortly after receiving the title, defendant made the conveyance of a small portion of land to Lamb, taking back a trust deed for his own benefit. Afterwards Lamb reconveyed the tract to him, and no actual injury has resulted to complainant. It is insisted by defendant that no real sale was made; that the whole thing was a sham, for the purpose of giving an apparently high value to the land to be used in litigation over some condemnation proceedings instituted by the Belt Railway. There is nothing to show that this claim is not true, and this matter may therefore be put one side.

With regard to the moneys received from the Missouri Pacific Railway and the Belt Railway, unquestionably those moneys were received by defendant, and have never been paid over to complainant. Unquestionably, too, complainant was aware of the condemnation proceedings instituted by the Belt Railway. Whether he knew of the receipt of the money from the Belt Railway, or the sale of the Missouri Pacific and the receipt of the money therefor by defendant, are matters in which the testimony of the complainant and the defendant are directly opposed, and there is no outside testimony to determine between them. I pass these matters, therefore, with no further comment.

I come now to the consideration of the four matters mentioned in the contract. It appears from the contract that it was deemed for the interest of the parties that releases should be obtained from the Anthony heirs of some supposed claims held by them against the land in question. On the same day, or at least during the same month, a further agreement was signed by the parties by which defendant was authorized to obtain a release by quitclaim from said heirs for the sum of $8,559, the money therefor to be advanced by complainant as for the other purchases. At the close of such agreement will be found these words: "Of course, you will purchase said claims at the lowest price, and at any less sum that you can purchase them for, the balance to be returned to me." This was signed by both parties. As a matter of fact, defendant obtained these quitclaims from all the heirs, save one for $2,400.30. These quitclaims were represented by three deeds; in one of which the consideration named was $3,380, in another $1,690, and in the third $3,378, aggregating $8,448. On the twelfth of February he drew for $8,450 to

pay for these quitclaims. From his letters during that month the only fair inference is that he had purchased releases from all the heirs, though now he testifies that there still remains one whose interest has not been obtained. The considerations named in these deeds correspond within two dollars with the amount for which he drew, and it is difficult to believe that he did not intend to represent to complainant that the sum which he had drawn was the sum he had paid for the releases already obtained. I have little doubt that such was the fact, and that he intended to charge, and did charge and collect, from the complainant, the sum of $8,500, as the purchase price of property for which he paid only $2,400.

Again, it is provided in the contract that defendant should purchase from John S. West, if possible, his tract of 69 acres, at a price not to exceed $400 per acre, amounting to $27,600. He did, in fact, purchase it for $20,000, paying $5,000, and giving a mortgage for the balance. He drew for $14,600, to pay John S. West, or $9,600 above the cash paid. The unpaid balance of $15,000 complainant has since had to pay. Defendant's explanation is this: That he had at one time a contract for the purchase of this land at $20,000; failing to take the land at the time stipulated, West commenced a suit in attachment, attaching defendant's interest in the Goodrich tract. In that suit a bond for $7,500 was given; this suit was dismissed by West. Thereafter defendant commenced a suit on the attachment bond, and subsequently a second suit against West for $15,000, for breach of his contract to convey. A part of the consideration of the purchase of this contract was the dismissal of these suits. With this explanation it would still leave $2,000 more drawn for than was paid, for $20,000 was the cash consideration, of which $5,000 was paid. Nor can it for a moment be supposed that the parties in this contract contemplated other than cash considerations, or that the complainant ever authorized defendant to put his own value on his speculative law suits, and charge that value to complainant as a part of the purchase price of the land.

Again, the contract recited that defendant held a contract with Marion West, the guardian of Frank West, Thomas West, and Joseph C. West, minors, for the purchase of three separate tracts belonging to said minors, for the sum of $44,559, and authorized him to complete the purchase thereof. He did complete the purchase, but in fact paid $41,448, notwithstanding he drew for and received the sum of $44,559. It is true, he testifies that he paid $4,036.37 above the sum of $41,448, but the considerations named in the deeds amount only to the sum of $41,-448, and Mrs. West testifies that that is all that she received.

Again, the contract recites that he has a contract with P. Cardenas, of New York city, for the purchase of 36 47-100 acres for the sum of $21,-882, and authorizes him to complete that purchase. He did so, paid the sum of $21,882, and obtained a deed. The facts with respect to that are these: In 1882 he had purchased this land for $10,941, paying $3,000 down, and giving security on the land for the balance. He immediately conveyed this land to P. Cardenas, and had formally ex-

ecuted a contract for a reconveyance at twice the former price, to-wit, $21,-882. This P. Cardenas was a woman in New York who lived with him as his mistress, bore him a child in 1884, and died shortly thereafter. He claims that after she had lived with him awhile as his mistress, their affection for each other became so strong that, while no ceremony of marriage was ever performed, he recognized and treated her as his wife; that in the early stages of their relationship he gave her $16,000; and that he had a portion of this money with him, out of which he made the first payment. A check given by complainant for the purchase price was indorsed by her, and deposited in a bank in New York city to her credit, but the proceeds were soon drawn out, part of them passing directly, as is obvious from the bank-books, to the account of defendant; and when she died in the fall of 1884, according to his own statement to two or three witnesses, she left no property. But one conclusion can fairly be drawn, and that is that the property was all the while his, and her name was used simply to enable him to double the price to any purchaser.

These are the salient facts as they appear from the testimony. By his own admission he has $21,336.70 of complainant's money. As against this he says that he has paid out for expenses $7,519, and that he has had no compensation for his services, which he claims were very valuable. He says that he advised the complainant of these matters, a statement which complainant denies. So far as the testimony of these parties contradicts each other, and is unaffected and unsupported by outside testimony, the only fair way is to discard both; and yet, even in their contradictions, regard must be had to the inherent probabilities based upon the situations of the parties. It must be borne in mind that this contract was made in February, 1884; that during that month all these purchases were made, all this money drawn from complainant. This controversy did not arise until the spring of 1885. The letters that were written by defendant contained no statement or suggestion of this overplus of money that was drawn, but on their face carried the idea that only that was drawn that was actually paid out. The contract provided specific compensation, both in manner and amount, for the services of the defendant. Complainant responded, apparently with no hesitation or doubt, to all drafts made upon him, and if anything further in the way of expenses had been incurred, and he had been called upon to pay them with a statement of the items and amounts, there is no reason to doubt that he would have promptly responded. He appears to have then had every confidence in defendant. Complainant's recompense for his money, and defendant's compensation for his services, were specifically prescribed in the contract, and neither had a right to claim more or other. If any claim existed on behalf of defendant other than those provided for, it was not for him to draw money on the pretext of payment for lands, and hold it as compensation therefor. If the settlement of his two suits against John S. West was worth anything, it was not for him to value them at $7,600, and draw for that as a part of the apparent price of the land. But one conclusion can be drawn from this testimony; that is, that in each of these four transactions he drew from his principal, as supposed

purchase money, thousands of dollars more than he actually paid out. Could any clearer case of gross misconduct be disclosed? Can it be said that after such misconduct in purchasing, complainant is still bound to accord him the right to sell and give to him the commissions and profits of such sales? He who cannot be trusted to buy, cannot be trusted to sell; if he defrauds in the purchase, can it be otherwise than that he will defraud in the sale? He who yields not common honesty in the one direction, forfeits all rights in the other. It is said by counsel, and the testimony seems to warrant the assertion, that this land has become very valuable, and that the profits on its sale would be simply enormous, and the question is asked, ought defendant to be deprived of his share of these profits? It may be hard punishment, and yet the law in every page and sentence of its sacred volumes iterates and reiterates the ancient truth that honesty is the best policy, and affirms that the agent who deliberately defrauds his principal, justly forfeits all right to commissions and compensations, as well as loses his time and labor.

The charges of the bill are proved; the defendant as the agent, an agent with an interest, deliberately defrauded his principal, the complainant, and therefore has forfeited all the interest and rights given to him by this contract; and the complainant is entitled to a decree as prayed for.

In the law case which is brought to recover the money fraudulently drawn from complainant, I state the account thus:

| | | |
|---|---:|---:|
| Amount received, - - - - - - | | $92,882 70 |
| Amount paid out for Cardenas' tract, - - | $10,941 00 | |
| For the West minors' tracts, - - - | 41,448 00 | |
| For the John S. West tract, - - - | 5,000 00 | |
| For the Anthony heirs' releases, - - | 2,400 30 | |
| For expenses shown in letter February 12th, and allowed, - - - - - - - | 500 00 | 60,289 30 |
| Balance, - - - - - - - | | $32,593 40 |

—For which judgment will go.

The declarations of law requested by complainant are given.