## SHAEFFER *v.* BLAIR.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 178. Argued March 27, 1893.—Decided May 1, 1893.

By a contract in writing, A and B agreed that certain lands, for the sale and conveyance of most of which A held agreements of third persons, should be purchased for the mutual interest of A and B, and the legal title taken in A's name, and conveyed by him to B; that B should advance to A the sums required to pay the purchase money, as well as other expenses to be mutually agreed upon from time to time, and be repaid his advances, with interest, out of the net proceeds of sales; that A should attend to preparing the lands for sale, and sell them, subject to B's approval, at prices mutually agreed upon, and retain a commission of five per cent on the gross amount of sales, and, until B was reimbursed for his advances, deposit the rest of the proceeds to B's credit in a bank to be mutually agreed upon; that, when B had been so reimbursed, "then the remainder of the property shall belong sixty per cent to B and forty per cent to A;" and that the property should be prepared for sale "by A or assigns" within a certain time, unless extended by mutual agreement. A fraudulently obtained from B much larger sums of money

than were needed to pay for the lands, procured conveyances of the lands to himself, and refused to convey them to B. *Held*, that, whether the contract did or did not create a partnership, (and *it seems* that it did not,) the equitable title in the lands, after reimbursing B for his advances with interest, belonged three fifths to B and two fifths to A; and that A's fraudulent misconduct, while it deprived him of the right to the stipulated commissions, did not divest him of his title in the lands.

THIS was a bill in equity, filed December 8, 1885, by John I. Blair, a citizen of Missouri, against Samuel C. Shaeffer, a citizen of Ohio, and other persons, citizens of other States, claiming under him, setting forth a contract in writing between the plaintiff and Shaeffer, dated February 4, 1884, (which is copied in the margin,[1]) and praying that Shaeffer might be

---

[1] Whereas, by virtue of a certain contract made by Samuel C. Shaeffer, of Lancaster, Ohio, with P. Cardenas, of New York city, for the purchase of thirty-six and $\frac{47}{100}$ acres of land in Jackson County, Missouri, and known as lot 7 of the partition of the estate of Thomas West, deceased, by the circuit court of Jackson County, Missouri, on October 18, 1880, as per contract dated November 1, 1883, for which said land the said Shaeffer was to pay the said Cardenas the sum of $21,882 on or before February 8, 1884. Now it is agreed, as said contract is made by said Shaeffer for said land, and for prudential purposes, that the same shall be conveyed by warranty deed to said Shaeffer; and that John I. Blair, of Blairstown, New Jersey, has paid for the same by giving to said Shaeffer a check on the National Park Bank of New York city for the sum of $21,882, signed by the president of the Belvidere National Bank of New Jersey, to enable him to pay for the said land.

And whereas, by another agreement made by said Shaeffer with Marion West, of Jackson County, Missouri, dated July 24, 1882, and October 21, 1882, whereby said Marion West sold the interests of Frank West, Thomas West and Joseph C. West, minor heirs of Thomas West, deceased, and known as lots 5, 6 and 8, of the partition of the estate of said Thomas West, deceased, by the circuit court of Jackson County, Missouri, on October 18, 1880; for which said land, by said contract, said. Shaeffer was to pay the sum of $44,559; $10,000 to be paid cash upon the delivery of deed; and the remainder, $34,559, to wit, $17,279.50 on or before February 8, 1885, and $17,279.50 on or before February 1, 1886, bearing eight per cent interest from February 1, 1883, and secured by mortgage on said premises. The said John I. Blair has given to said Shaeffer a check, signed by the president of the Belvidere National Bank of New Jersey, on the National Park Bank of New York city, for $10,000, to enable said Shaeffer to pay that much on account of said lands, and for prudential reasons to obtain a deed for the same in his own name. The said Blair is to pay the

ordered to convey to the plaintiff the lands described in that contract, and that it be adjudged that the defendants had no title or interest therein, and for further relief.

---

balance of the purchase money at maturity, amounting to $34,559, given by said Shaeffer and secured by mortgage.

This makes at this time the cash payments on the above two contracts $21,882 and $10,000, making $31,882, which is to bear eight per cent interest until paid out of the sales of the land aforesaid, the interest to be added to the principal yearly, and bear eight per cent interest until paid.

Within four months after said Shaeffer shall have obtained the title to said lands, or sooner, if desired by said Blair, said Shaeffer to make a warranty deed to said Blair for said lands.

Now it is further agreed that, for the mutual interest of said Blair and Shaeffer, it may be deemed advisable to obtain certain releases for pretended claims made by the Anthony heirs to said property, the sum for said purpose to be mutually agreed upon, which sum said Blair agrees to furnish to said Shaeffer, upon telegraphic notice, to aid him in securing said releases; and said Shaeffer afterwards to deed by release deed said lands to said Blair. Said money to bear same rate of interest and governed by same conditions as hereinbefore stipulated, the same to be endorsed on this contract, or other written evidences given that said Blair paid the money.

It is deemed for the mutual interest of said Blair and Shaeffer, that said Shaeffer purchase the sixty-nine acres of land from John S. West, adjoining the above-described lands, at a price not to exceed $400 per acre, amounting to $27,600, and to obtain a warranty deed therefor. Said John I. Blair has given said Shaeffer the president's check of the Belvidere National Bank of New Jersey, on the National Park Bank of New York city for $14,600, as part payment for said sixty-nine acres of land. If said property cannot be purchased for said $27,600, then said $14,600 check to be returned to said Blair unused. Said Blair agrees to assume and pay $13,000 mortgage on said property, which said Shaeffer will give to said West, payable in one or two years, and bearing eight per cent interest, in case said purchase can be made; said Shaeffer, within four months after obtaining title to said land, to deed same to said Blair. All the money paid and furnished and assumed, to pay for said land, by said Blair, to bear eight per cent interest, and be added to the principal each year until paid.

All moneys necessary to stake off lots, grade streets, advertising, office furniture, fixtures, rents, stationery, taxes, and such other expenses as may become necessary for the improvements and sale of said property, as may be mutually agreed upon from time to time by said Blair and Shaeffer, shall be furnished by said Blair.

Said Shaeffer is to deduct and receive five per cent commission upon gross sales of all lots sold at the agreed price or over, made by said Blair and Shaeffer; and the remainder to be deposited in some bank in Kansas City, that may be mutually agreed upon, to the credit of said John I. Blair, until

At the hearing in the Circuit Court, upon pleadings and proofs, the case appeared to be in substance as follows : In February, 1884, Shaeffer obtained and received from the plaintiff sums of money amounting to $92,882.70, upon fraudulent representations that they were needed to pay for the lands described in the contract ; and, within a month after its date, procured conveyances of those lands to himself, by paying therefor sums amounting to $59,789.30 only, and paid $500 for taxes and other necessary expenses, leaving the sum of $32,593.40 due to the plaintiff; and afterwards refused, on

---

all the money he has paid or advanced, with interest as aforesaid, shall have been returned to him. At the end of each month, said Shaeffer is to report the amount to the credit of said Blair, the same to be subject to said Blair's draft on account of the money advanced or paid for the property and otherwise as aforesaid.

All contracts for the sale of said land or lots to be made in triplicate, and approved by said John I. Blair, or some one appointed by him; on the back of said contracts the word "approved" or "rejected" to be written and signed by said John I. Blair, as aforesaid; one copy of said contract to be retained by said Shaeffer, and one by the purchaser. It shall be specified on the face of said contracts that they shall not be valid unless approved as specified; and all contracts to be made payable to said John I. Blair.

When said Blair shall have been paid in cash, for all the money advanced and furnished by him for the purchase of said lands, and other moneys, and the interest thereon, as specified, then the remainder of the property shall belong, sixty per cent to said Blair and forty per cent to said Shaeffer; and then said Shaeffer shall not be required to deposit in the aforesaid bank, as aforesaid specified, to the credit of said Blair, more than sixty per cent of the net proceeds of sales of said lands or lots.

If it is at this time desirable to divide said lots or land between said Blair and Shaeffer, said Blair to take sixty per cent, and said Blair to convey the title to forty per cent of said property or lots by warranty deed to Shaeffer; or said Shaeffer to sell the lots or lands as aforesaid, and divide the net proceeds of sale, sixty per cent to said Blair and forty per cent to said Shaeffer.

It is understood that said property, or any portion thereof, to be staked out and prepared for sale within one year, by said Shaeffer or assigns, after the Kansas City Belt Railway shall have been completed to said property, unless otherwise postponed in writing by said Blair and Shaeffer.

In witness whereof the parties hereto have hereunto set their hands and seals on this 4th day of February, 1884, at Kansas City, Missouri.

· SAMUEL C. SHAEFFER.  [SEAL.]

JOHN I. BLAIR.        [SEAL.]

demand, to convey the lands to the plaintiff. The three tracts of land described in the contract contained, respectively, about thirty-six and a half acres, about one hundred and thirty-eight acres, and sixty-nine acres, near Kansas City, in the State of Missouri, and were worth more at the time of the contract than the sums paid by the plaintiff, and greatly increased in value afterwards.

In an action at law against Shaeffer, submitted to the Circuit Court without a jury at the same time with the present suit in equity, the plaintiff recovered judgment for the aforesaid sum of $32,593.40. Upon that judgment no writ or error was sued out.

In the present suit, the Circuit Court held that the contract sued on created no partnership between the plaintiff and Shaeffer, and conferred on Shaeffer only the right of an agent to sell, with a share in the profits by way of compensation; and that Shaeffer, by his fraudulent conduct, had forfeited all his rights under the contract, including not only the five per cent commission on sales, but the share of forty per cent in the net profits remaining after payment of the sums advanced by the plaintiff; and entered a decree for the plaintiff, as prayed for. 33 Fed. Rep. 218. From this decree Shaeffer appealed to this court.

*Mr. C. D. Martin* and *Mr. R. A. Harrison* for appellant.

*Mr. Charles O. Tichenor* for appellee.

I. It is contended that the payment by Blair for these lands was only a loan to Shaeffer, with the lands as security. But the contract creates no debt in favor of Blair. It carefully shields Shaeffer from any liability for the money which Blair is compelled to pay from time to time. Blair even agrees "to assume and pay" a mortgage which Shaeffer contemplates giving under the contract for a part of the purchase money. Blair binds himself to pay everything; Shaeffer binds himself to pay nothing; Shaeffer, under the contract, must get one-twentieth of the gross sales of the land, even if it is sold for one-half its cost.

II. Another defence, as stated in the answer, is, that "it does appear by said contract, and it is true and so intended by said Blair and Shaeffer, that said contract created a partnership concerning said lands and the proceeds of the sale thereof." Is this claim valid?

There are certain tests by which this question must be solved. What does the instrument show that they intended by it in this respect? For persons cannot be made to assume the relations of partners, as between themselves, when their purpose is that no partnership shall exist. *Burckle* v. *Echart*, 1 Denio, 337; *Beecher* v. *Bush*, 45 Michigan, 188; *Hazzard* v. *Hazzard*, 1 Story, 371; *London Assurance Co.* v. *Drennen*, 116 U. S. 461; *McDonald* v. *Matney*, 82 Missouri, 358.

It is nowhere stated in the contract that the parties were to be partners. There is nothing said about a firm name; in fact, there was no business to be carried on. The contract is not in the form of partnership contracts. There is nothing in it to lead Blair to suspect that he was making himself liable to a suit for dissolution, subjecting the land which he had bought and paid for to the risk of going into the hands of a receiver, to be sold under order of court, attended with delays, vexation and great expense. The word "assigns" is significant; a word not used in a partnership contract. To assign is to dissolve.

The relation of the parties to each other was simply that of principal and agent. In no way was Blair the agent of Shaeffer, and the latter never had the authority of a partner. The contract made him an agent with limited powers; if he exercised any discretion he violated his contract. He did not have the power of an ordinary real estate agent, and his acts could have created no partnership liabilities, even as to third persons, for the contract was entitled to record and when recorded was notice.

Lord Wensleydale says, in *Cox* v. *Hickman*, 8 H. L. Cas. 268, 312: "The law as to partnership is undoubtedly a branch of the law of principal and agent; and it would tend to simplify and make more easy of solution the questions which arise on this subject, if this true principle were more

constantly kept in view. . . . A man who allows another
to carry on trade, whether in his own name or not, to buy and
sell and to pay over all the profits to him, is undoubtedly the
principal, and the person so employed the agent, and the prin-
cipal is liable for the agent's contracts in the course of his
employment." See also *Winel* v. *Stone*, 30 Maine, 384;
*Thompson* v. *Bowman*, 6 Wall. 316.

In the leading case of *Meehan* v. *Valentine*, 145 U. S. 611,
623, this court, while criticising what was said by Lord Wens-
leydale as to agency, approves of the rule laid down in *Cox*
v. *Hickman;* and Mr. Justice Gray, speaking for the court,
says: "If they do this, the incidents or consequences follow,
that the acts of one in conducting the partnership business are
the acts of all; that each is agent for the firm and for the
other partners; that each receives part of the profits as profits,
and takes part of the fund to which the creditors of the part-
nership have a right to look for the payment of their debts;
that all are liable as partners upon contracts made by any
of them with third persons within the scope of the partner-
ship business; and that even an express stipulation between
them, that one shall not be so liable, though good between
themselves, is ineffectual as against third persons."

Here there was no community of interest in the land. True,
Shaeffer, at first, took the title not because he owned an in-
terest, but for prudential reasons. He held it for Blair, and
was compelled to convey to him. Shaeffer was never to get
any interest unless the speculation turned out favorably, and
then solely as compensation, because there were profits. Such
an interest did not work a change, either in possession or title.
*Drennen* v. *London Assurance Co.*, *supra;* *Musser* v. *Brink*,
68 Missouri, 242. There was no community of profit; no
interest in the profits as principal; no specific interest in
profits as profits, in contradistinction to a stipulated portion of
the profits as compensation for services.

So, then, we say, Shaeffer was to have no partnership or
property right, from the start, in the profits; but his interest
was only at the end, when the land was sold; and not even
then, unless he had performed the services contemplated by

the contract on his part. *Hanna* v. *Flint*, 16 California, 76; *Walker* v. *Hirsch*, 27 Ch. D. 460; *Durkee* v. *Gunn*, 41 Kansas, 496; *Holmes* v. *Old Colony Railroad*, 5 Gray, 58. *Seymour* v. *Freer*, 8 Wall. 202, is not in conflict with our contention.

If the contract of February 4, 1884, created neither the relation of partnership nor that of debtor and creditor, it made Shaeffer the agent of Blair for the purposes specified in the contract. *Dieringer* v. *Meyer*, 42 Wisconsin, 311; *Phœnix Mutual Life Ins. Co.* v. *Holloway*, 57 Connecticut, 310; *Vennum* v. *Gregory*, 21 Iowa, 326; *Balsbaugh* v. *Frazer*, 19 Penn. St. 95; *Farnsworth* v. *Hemmer*, 1 Allen, 494; *S. C.* 79 Am. Dec. 756.

Blair's case is stronger than any case cited, for the evidence shows that the fraud accomplished was by means of the contract, and was in pursuance of a design formed prior to the execution of the contract. Even though the contract made them partners, yet, under such circumstances, a court would decree it a nullity, leaving Blair with the land which he bought to put into the partnership. *Hynes* v. *Stewart*, 10 B. Mon. 429; *Gibson* v. *Cunningham*, 92 Missouri, 131; *Newbigging* v. *Adam*, 34 Ch. D. 582; *Oteri* v. *Scalzo*, 145 U. S. 578.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The decision of this case turns upon the construction of the contract of February 4, 1884, by which the parties agreed to buy certain lands and to sell them again for the joint benefit of both.

The provisions of that contract were, in substance, that those lands, in the greater part of which Shaeffer already had an equitable title under agreements of third persons to sell and convey them to him, should be purchased, for the mutual interest of the parties; that the legal title in all the lands should be taken in Shaeffer's name, and be conveyed by him to Blair; that Blair should advance the sums required to enable Shaeffer to pay the purchase money of the lands, as

well as the necessary expenses of preparing them for sale and selling them, and should be repaid his advances, with interest, out of the net proceeds of sales; that Shaeffer should stake out the lands for sale, make the necessary improvements, sell them, retain a commission of five per cent upon the gross amount of sales, and, until Blair should have been reimbursed for his advances, deposit the rest of the proceeds in a bank to Blair's credit; that the expenses of improving and selling the lands, the time within which they must be prepared for sale, the price at which they might be sold, and the bank in which the proceeds should be deposited by Shaeffer, should be mutually agreed upon between him and Blair, and all contracts of sale by Shaeffer should be approved by Blair; and that, when Blair should have been reimbursed for all his advances, "then the remainder of the property shall belong, sixty per cent to said Blair and forty per cent to said Shaeffer," and be divided between them accordingly, either by Blair's conveying the title in two fifths of the lands to Shaeffer, or by Shaeffer's selling the lands and paying sixty per cent of the proceeds to Blair.

The contract evidently contemplated that, while the sales to be made by Shaeffer should be subject to Blair's approval, no sales should be made by Blair without Shaeffer's consent. This clearly appears from several provisions of the contract. It is by Shaeffer, or, as said in the last clause of the contract, "by said Shaeffer or assigns," that the lands are to be staked out into lots and prepared for sale. "Said Shaeffer is to deduct and receive five per cent commission upon gross sales of all lots sold at the agreed price or over, made by said Blair and Shaeffer," that is to say, "of all lots sold" by Shaeffer "at the agreed price or over," the price (not the sales) being "made by said Blair and Shaeffer." The provision that all contracts of sale shall be made in triplicate, and approved in writing by Blair, and one copy retained by Shaeffer, clearly implies that all contracts of sale shall be initiated by Shaeffer. And after Blair shall have been reimbursed his advances, then, if the lands are not themselves divided between them, it is Shaeffer who is to sell them and divide the proceeds.

In short, Shaeffer was to contribute to the venture his equitable title in the greater part of the lands to be purchased, as well as his own services; Blair was to contribute all the money required to carry out the enterprise; the legal title was to be taken in Shaeffer's name, and conveyed by him to Blair; Shaeffer was to attend to preparing the lands for sale, and to sell them, subject to Blair's approval; Shaeffer was to receive a commission of five per cent on the gross amount of sales; out of the rest of the proceeds, Blair was to be repaid his advances; and after Blair had been reimbursed, the property was to belong, three fifths to Blair and two fifths to Shaeffer, and to be divided between them accordingly, either in lands or in money.

Taking into consideration the whole scope of the contract, and the fact that, before it was made, Shaeffer had an equitable interest in the greater part of the lands, which was in fact, and was evidently considered by both parties to be, of greater value than the price which he had agreed to pay for them; that the title to all the lands was to be taken in Shaeffer's name in the first instance, and to be conveyed by him to Blair; and especially the express stipulation that, after Blair should have been fully reimbursed for his advances, out of the proceeds of sales, "then the remainder of the property shall belong, sixty per cent to said Blair and forty per cent to said Shaeffer," and should be divided between them accordingly; the conclusion appears to us to be inevitable, that the conveyance of the legal title by Shaeffer to Blair, like the deposit of proceeds of sales made by Shaeffer to Blair's credit, was intended as security only for Blair's advances; that Shaeffer was to have and retain an equitable title in two fifths of the land, subject to the claim of Blair for reimbursement; and that Shaeffer's fraudulent misconduct, while it might properly defeat any claim of his for commissions, did not divest him of his equitable title in the lands, as recognized and stipulated for in the contract.

There may doubtless be a partnership in the purchase and the resale of lands, as of any other property. But this contract contains no expression to indicate an intention of the

parties to become partners. It does not authorize either party, without the consent of the other, to sell any property, or to contract any debts, on behalf of both. If the enterprise proves unsuccessful, the contract does not provide or contemplate that Shaeffer shall share the loss. And the phrase "said Shaeffer or assigns" in the last clause (unless supposed to be inadvertently inserted) is hardly consistent with the idea of a partnership. There is great difficulty, therefore, in the way of construing this contract as creating a partnership between Blair and Shaeffer. *Thompson* v. *Bowman*, 6 Wall. 316; *Seymour* v. *Freer*, 8 Wall. 202; *Meehan* v. *Valentine*, 145 U. S. 611, 623.

But it is unnecessary to express a decisive opinion upon that point, because, whether Shaeffer was acting as a partner, or only as an agent, in performing the duties required of him by the contract, the fraudulent misconduct proved against him deprived him of the right to the stipulated commissions. *Denver* v. *Roane*, 99 U. S. 355; *Wadsworth* v. *Adams*, 138 U. S. 380. And whether he was or was not a partner, that misconduct did not operate to forfeit his equitable title in the lands.

The result is, that Blair is not entitled to the entire property, except as security for the sums advanced by him, and for any reasonable expenses, including the amount ascertained by the judgment at law between the parties, (so far as they remain unpaid,) with interest computed according to the contract; and that, after reimbursing him for such advances and expenses, the lands belong, in equity, three fifths to Blair and two fifths to Shaeffer.

The decree of the Circuit Court, adjudging that Shaeffer has no title or interest in the lands, is therefore erroneous, and must be reversed; and the case is to be remanded to that court, with directions to order that the lands, or so much thereof as may be necessary to pay and satisfy the sums due to the plaintiff for advances and expenses, be forthwith sold, and the proceeds applied to the payment of those sums; and that any lands or proceeds remaining, after so reimbursing the plaintiff, be divided between him and Shaeffer in the proportions aforesaid.

Names of Counsel.

*Decree reversed, and case remanded to the · Circuit Court for further proceedings in accordance with the opinion of this court.*

Mr. Justice Brewer dissented.

Mr. Justice Field was not present at the argument, and took no part in the decision.