## CORBIN et al. v. HOLMES.

## HOLMES v. CORBIN et al.

(Circuit Court of Appeals, Eighth Circuit. May 13, 1907.)

Nos. 2,363, 2,417.

**1. JOINT ADVENTURES—SALE OF LAND—CONTRACT—CONSTRUCTION.**

Defendant's testator, having purchased a quantity of wild land for $26,076.60, contracted with B., plaintiff's assignor, for the sale thereof as follows: That, in case B. totally failed to make sales during the first five years, the arrangement should terminate; that if there was a partial

154 F.—38

failure to reimburse testator at the end of 10 years to the amount of his investment, with 10 per cent. annual interest, the arrangement should be terminated, and B. should receive 5 per cent. commission on sales made; and, if at the end of the 10 years testator should have been so reimbursed, B. should have one-half of the profits. At the end of the 10-year period there remained unsold 6,445 acres of land, and there was a net deficit of over $17,000 before testator's investment would be made good, of which more than $11,000 was in outstanding notes with accrued interest, and more than $6,000 was represented merely by unsold lands. *Held*, that such facts showed the happening of the conditions required by the second provision of the contract, and that the same terminated at the end of the 10 years, B. being entitled only to 5 per cent. commission on sales made up to that time.

2. SAME—LIEN.

B. did not acquire any interest in or lien on the lands under the contract, and was therefore not entitled to require a sale by process of court or otherwise, in order to repay testator's investment and to wind up the joint account.

3. PARTNERSHIP—CONTRACT.

Where plaintiff's testator, having purchased certain lands, placed them in the hands of B. for sale, agreeing that, if no sales were made within five years, the arrangement should be terminated; if sufficient sales were not made to enable testator to get his money back with interest, B. should receive 5 per cent. commissions on sales made; and if testator was reimbursed within that time B. should receive one-half of the profits—the arrangement did not constitute a contract of partnership between them.

4. JOINT ADVENTURES—CONTRACTS—ACCOUNTING.

Testator, having purchased certain land, agreed with B. that the latter should manage the sale thereof for 10 years, and in case sufficient sales were not made within that time to reimburse testator for his outlay, with 10 per cent. interest, B. was to receive 5 per cent. commissions on sales made, and, if the receipts were sufficient so to reimburse testator, B. should receive one-half of the profits. *Held*, that on termination of the contract period testator was entitled to be credited with interest at 10 per cent. on his investment, together with disbursements for taxes, foreclosure expenses, expenses for recording mortgages, etc., and should be charged with interest at 10 per cent. on all receipts.

Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Minnesota.

W. P. Warner, for Elon G. Holmes.

George C. Austin (Owen Morris, on the brief), for Corbin's executors.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. Holmes, the successor in interest of one Bowman, obtained a decree against the executors of the will of Austin Corbin, deceased, for $21,718.49, being, according to the theory of the trial court, half of the profits realized in the purchase and sale of certain lands. Both parties appealed.

The controversy arose in the working out of a contract made in 1877 between Corbin and Bowman. Corbin, having purchased from one Dr. Upham about 13,500 acres of wild land in Minnesota for the sum of $26,076.60, made the following proposition to Bowman by a letter dated May 12, 1877:

"Now if you want to do this, you can. I will figure up exactly the cost as allowed the Doctor, put them in to you on joint account to run 10 years at 10% annual interest; I to have my money out first, and when it comes out you to have half the profits. I want this limited to 10 years, because I don't want it running indefinitely in case it don't work. If it don't operate at all at the end of five years, I shall expect you to release me from the trade, because it is not any object for you to be fiddling with a thing that don't pay, nor for me to be tied up and not do either of us any good. You will appreciate that, I guess. But the contract shall run for ten years. Then, if at the expiration of ten years it cannot be wound up, and I get my money out, I will agree that you will have 5% allowed on all sales that have been made, so that you will, in any event, not be doing this absolutely for nothing."

On May 21, 1877, Bowman, referring to the proposition of Corbin, wrote as follows to a representative of the latter:

"Dear Sir—I have your favor of the 16th informing me that Mr. Corbin had that morning left. I suppose of course, you mean that he has gone to Europe. He (Corbin) wrote that if I want to agree to a 10% joint account with him by and under the terms of which he is to pay all the taxes and pay for the land and I am to sell the lands and turn over all the proceeds to him until all his money invested with 10% interest is paid, etc., that at the end of 10 years if he shall not have received all his money and interest out of the sales, the joint account shall be wound up and I shall have 5% for all the lands I have sold, etc., etc., as will more fully appear by reference to the copy of the letter on your books, and he asked me for a reply, so I say that I will undertake to live the 10 years and sell during that time all of the lands I can according to the proposition he makes me."

It was by these two letters that the contract was formed. The cost of the lands to Corbin was found by the trial court to be as above noted, and, though the finding is assailed by the complainant Holmes in his cross-appeal, it is well sustained by the facts. Shortly after the contract was made 560 acres of the land were sold to the complainant's wife, and eliminated from the account. The transaction worked a reduction of the principal of Corbin's investment to the sum of $24,993.93. The principal question in the case is presented by the contention of Corbin's executors that a wrong construction was put upon the contract. Upon the theory that time was not of the essence of the contract, the complainant was given a decree for half of the profits of the venture, although Corbin had not at the expiration of the 10 years been reimbursed his investment with interest. When the end of the 10-year period, May 21, 1887, came around, this was the condition: There remained unsold 6,445 acres of land. After crediting Corbin with the original cost of the lands and interest at 10 per cent. and with his disbursements for taxes and expenses for foreclosures, etc., with interest at 7 per cent., there still remained due to him $16,079.70, or about two-thirds of his original investment. At the same time there were on hand unpaid purchase-money notes amounting, with accrued interest, to $11,599.55. Upon the assumption that these notes should be charged to Corbin as cash, there nevertheless remained a balance at the end of the 10-year period of $4,480.25. In reaching this balance the trial court allowed Corbin but 7 per cent. interest upon his disbursements for taxes and expenses, whereas, as will be noted hereafter, we are of the opinion that he was entitled to 10 per cent.; and upon this basis the net deficit at the end of the 10-year period was $6,035.93, after charging Corbin with more than $11,000 of uncollected notes and mortgages

with accrued interest. This deficit was nearly one-fourth of his original investment. The trial court said:

"My direction of this accounting is based upon my holding that time was not of the essence of this contract, in such strictness that, if it was nearly but not strictly carried out within the 10 years, the complainant should forfeit absolutely all advantage substantially earned in carrying it out."

It seems quite probable that the substantial amount of the deficit and the substantial proportion it bore to the original investment, even after charging Corbin with the uncollected purchase-money notes, was not clearly perceived by the trial court when it adopted the theory upon which the decree proceeded.

Does the language of the contract permit of the construction that was given to it? In the consideration of this question it is well to bear in mind the settled rule that although time is not ordinarily of the essence of a contract for the sale of real property, yet it may appear to be so either by express stipulation to that effect or by clear implication from the terms employed; that courts have no right to make a contract for the parties, or to insert stipulations which it is clear they did not intend; that it is only when the question is at large, and is not foreclosed by the terms of the contract or the nature of the property which is the subject of it, that the courts will apply equitable considerations to the construction, so that justice may be done to the defaulting party without injury to the clear rights of the other. But the primary question always is, is it clear what the parties really intended by the language which they themselves employed? If it is, it is then the duty of a court to respect their intention. In the construction of the contract the trial court confined itself to the terms of Corbin's proposition. But the terms of Bowman's acceptance should not be regarded as mere subsequent declarations, useful as an aid to construction of a contract the import of which is doubtful. On the contrary, Bowman's acceptance was an integral part of the very contract that was entered into. Four times did Corbin, the owner of the lands, mention a 10-year period in his proposition. Each time he referred to the period within which he should get his money out. And Bowman said in accepting the proposition "that at the end of ten years if he (Corbin) shall not have received all his money and interest out of the sales the joint account shall be wound up and I shall have 5% for all the lands I have sold." Note that Bowman said "all his money," not part of it. Bowman further said that he would undertake to live the 10 years and sell all of the lands he could during that time. And note that this undertaking was limited to 10 years, and did not extend an indefinite time thereafter.

One of the strongest arguments in favor of the construction asked by Corbin is the existence of the provision for the payment of the 5 per cent. commission on the sales if he had not succeeded in getting all of his money back in 10 years. In other words, Corbin recognized the equities of the situation, and that it would be a hardship upon Bowman to deprive him of all compensation for his labors if he succeeded in making sales, but not enough to pay out. This alternative, proposed and accepted in itself, provided a compensation not unusual in such transactions; and it robs the case of those harsh features which cause

a court of equity to pause and seriously consider whether the parties so intended when their minds met in mutual agreement. Corbin and Bowman chancered their own case. They provided for (1) total failure to make sales during the first five years, (2) partial failure to fully reimburse Corbin at the end of 10 years, and (3) complete success in reimbursing him. If the arrangement had not operated at all at the end of five years, it was to be at an end. If it did operate and at the end of 10 years there was a partial failure in getting all Corbin's money out, there was to be a 5 per cent. commission. If there was complete success at the end of 10 years, then Bowman was to have a half interest in the remaining property and receipts. The line between partial failure with a commission and complete success with a proprietary interest in profits is indicated by the words of Bowman's acceptance—"If he shall not have received all his money and interest out of the sales"; and also by the words of Corbin in his proposition: "Then if at the expiration of ten years it cannot be wound up and I get my money out," etc. A deficit of $18,000 out of an original investment of $25,000 so obviously brings the case within the 5 per cent. commission clause as to preclude argument. Of this deficit more than $11.000 was in outstanding notes with accrued interest, and more than $6,000 had nothing behind it excepting Corbin's unsold lands. Upon what theory the outstanding notes were charged to Corbin does not appear. That they should not be so charged was recognized by the complainant when, in drafting his bill, he was careful to aver that Corbin had his money out, exclusive of outstanding purchase-money notes and mortgages.

But, however the uncollected purchase-money notes and mortgages should be regarded, there still remained over $6,000, about one-fourth of the original investment, unmet by any sales of lands. Although this amount is a substantial one, we are asked to remake the contract upon considerations of degrees of performance, and to give Bowman one-half the value or proceeds of unsold lands after Corbin shall have been paid therefrom the remainder of his investment. If this may be done, it would be interesting to know at what degree of failure to fully perform the 5 per cent. commission clause would apply, and at what lesser degree of failure the complainant would be entitled to a proprietary interest in the surplus. Suppose the deficit, after charging Corbin with uncollected notes, had been $7,000 or $8,000 or $10,000, what would we say? Of course, both the spirit and the letter of the contract preclude a reimbursement of Corbin's investment by his own lands in specie. The contract could not be wound up by setting off to Corbin a part of the lands that were really his and by dividing the remainder. To do so would be repugnant to the contract in any phase in which it may be considered. Corbin wanted his lands sold, not left on his hands. He wished his investment fully returned to him in cash within the 10 years. The contention of complainant, if sustained, would practically deprive the commission clause of the contract of its intended office. For all substantial purposes it would stand expunged, and the logical conclusion would be that, by selling a few tracts of land during the first five years to escape annulment of the contract, Bowman could have remained idle during the remainder of

the 10-year period and taken chances of such enhancement in values as would give him an equity to be realized by the forced sale of Corbin's lands and a division of the surplus proceeds. If due effect is not to be given to the agreement for a commission, then, to earn an interest in surplus proceeds or value, Bowman had the option either to be diligent to sell enough to repay Corbin in full, or to remain inactive and take chances on the market and a public sale at the end. But nothing could be further from the intention of the parties than the latter course. Corbin, who owned the lands, wanted them sold at private sale and his investment fully repaid within a fixed period. He offered Bowman not an interest or a lien, but compensation for faithful, active, and industrious services. To stimulate him to extra efforts he offered an opportunity to make more than the usual commission, and said that if within 10 years Bowman sold enough to repay him in full, not partially, he might have half the surplus. That diligence was expected by Corbin and promised by Bowman is clear beyond every doubt, and upon the measure of the diligence and its results depended the amount of compensation—if nothing was accomplished in the first five years, an abandonment of the contract followed; if sales were made but insufficient at the end of 10 years to repay Corbin in full, a commission of 5 per cent.; if sales were made sufficient at the end of 10 years to repay Corbin in full, then half of the surplus. This is the obvious reading of the two letters forming the contract, it was the construction put upon them by the parties during the progress of the business, and also the construction adopted by complainant in framing his bill.

Bowman did not acquire any interest in or lien upon the lands, and therefore he had no right to require a sale, by process of court or otherwise, to get Corbin's money out and so wind up the joint account. This fact must always be regarded in every consideration of Bowman's right under the contract. The lands remained the lands of Corbin, and it was his province to say how they should be sold and to prescribe the limit of time within which sales might be made. The theory of a winding-up process after 10 years by judicial sale or other proceedings against Corbin in invitum to create funds to repay his investment is wholly repugnant to the intention of the parties who made the contract. Certainly, if regard is to be had to the words they employed, they never contemplated that a failure by one-fourth to secure a return to Corbin of his investment should render the provision for the commission inapplicable, and entitle Bowman to that compensation which depended upon repayment to Corbin in full within the period agreed upon. For us to say otherwise would amount to a recasting of the contract according to our own notions.

Corbin's expressed desire, assented to by Bowman, was that he should get all his money out, and within 10 years. This is as plain as the language of laymen could make it. The most liberal construction of the phrase "wound up" that is permissible is that at the end of 10 years a sufficient length of time should be given to cast up the accounts to see where the parties stood and for settlement on the basis thus disclosed. Indeed, we might go further and admit that if sufficient lands had been sold for cash and notes to pay Corbin's in-

vestment the complainant might be entitled to half of the excess had he or some one by his procurement unconditionally offered to take and pay for sufficient of the outstanding notes at par and accrued interest to complete the payment in full to Corbin. Nothing less than this would have met Corbin's rights under the contract. What did the complainant do? On March 12, 1887, shortly before the end of the 10-year period, he wrote to Corbin:

"In case you are not willing to accept of the notes and mortgages you hold account of sales made I will make an offer to give or take and have proceeds applied in that account. I am prepared to cash these notes and mortgages at any price we agree upon. I will also fix a price upon the lands remaining unsold to give or take and thereby be able to close the account at once, or I am willing to divide the lands remaining unsold."

These were his specific propositions. It will be observed that in fixing the value of the notes and mortgages he says that it shall be "as agreed upon," when his sole legal right, unless the contract was changed, was to take the notes at par. He obtrudes into the situation an assertion of a right to agree or disagree upon the value of the notes. But more than this, he couples with the proposition another one, to wit, that he will fix a value upon the remaining lands for a give or take offer. It must be recalled that a mere disposition of the notes would not have been sufficient to enable the parties to wind up the contract. Additional lands to the amount of more than $6,000 must have been sold, and of course it was wholly repugnant to the contract and the rights of Corbin, however regarded, that the complainant should be allowed to fix the price of the lands for a disposition or division. Even if it were to be held that the limit of 10 years might be disregarded and the time opened up and enlarged for more sales if they could be made within a reasonable time, there is nothing whatever in this record indicating that on May 21, 1887, it was at all probable that sufficient additional lands could be sold short of several years thereafter to make up the deficit. It took 10 years to sell sufficient to discharge three-fourths of Corbin's investment after. charging him with all outstanding purchase-money notes as cash. Measured by this experience, and assuming that market conditions would be substantially similar, it would require the allowance of more than three years' additional time to complainant to enable him to escape the operation of that clause of the contract which provides for a 5 per cent. commission. Again, in 1886, there were sold in round numbers 760 acres of land. If the same measure of success might have been expected in the years following, it would have taken nearly all of the years 1887 and 1888 to sell sufficient to wipe out the cash deficit if the lands were sold at the prevailing rate of $5 per acre. As a matter of fact the two sides of Corbin's investment account did not balance until December, 1897, more than 10 years after the expiration of the 10 year period agreed upon. It might be said, however, in this connection, that the lands were withdrawn from the complainant and he was not allowed to make the sales, but on the other hand they were put into the charge of another agent in 1888. From our knowledge of financial conditions which culminated in the crisis of 1893, it is doubtful that the market for real property for a number of years after 1887 was favorable to

the disposition of real estate. The trial court said in its decision upon the question of laches that during the years after the 10-year period the values of land declined. But all of this is ex post facto, and its principal value is to indicate the sea of uncertainty upon which we launch when we disregard the provisions made by the parties for the very contingency that arose and which they regarded as fair, equitable, and reasonable.

There is nothing whatever in this record until we come to the opinion of the trial judge, delivered in 1902, indicating that it was in the minds of the parties or their counsel that the contract could be so construed as to give a period beyond May 21, 1887, for the sale of additional lands to secure funds for the repayment of Corbin's investment so as to give complainant a proprietary interest in the excess. On October 5, 1886, complainant wrote to Corbin as follows:

"The time is near at hand when a settlement of the joint account *must* be made for the purpose of making an amicable settlement of the account I make you the following statement and proposition. The joint account commenced May 12, 1877, and by its terms will expire next May, hence the necessity of settlement."

He then stated an account, and, by understating Corbin's investment and by charging him with outstanding uncollected notes, showed the latter in debt to him. The word "must" in the first sentence of the letter was emphasized by being underscored. Moreover, the bill of complaint was framed upon the theory contended for by Corbin. In reciting the substance of the provisions of the contract it is averred:

"If the proceeds realized from said lands under said contract of copartnership, within 10 years from date thereof, should prove insufficient to pay said Austin Corbin for said lands, with interest as aforesaid, then said copartnership was to terminate and end; and in that case said John A. Bowman was to be paid out of the remaining assets of said copartnership, if sufficient for that purpose, and otherwise by said Austin Corbin, 5 per cent. of the proceeds of all sales of said lands theretofore made in full satisfaction of any and all claim in favor of said John A. Bowman on, in or to said copartnership assets or against said Austin Corbin."

(Of course the contract was not one of co-partnership. Shaeffer v. Blair, 149 U. S. 248, 13 Sup. Ct. 856, 37 L. Ed. 721.) The bill containing this averment was filed in the state court April 14, 1894. The same averment was repeated in the bill of revivor filed in 1898, 11 years after the expiration of the 10-year period. Both proceeded upon the theory that Corbin had been fully reimbursed his investment. We are of the opinion that under the clear facts of the case the decree below is contrary to both letter and intent of the contract, and the subsequent construction thereof by complainant himself for many years afterwards.

Complainant made an attempt to show that some dealings between Corbin and Bowman prior to the making of the contract were such as to give the latter an equitable interest in the lands, and that such equitable feature should be projected forward to qualify the contract that was made by the interchange of letters; but complainant wholly failed in the proof. There was also an attempt to show a voluntary continuation of the relations of the parties after May 21, 1887, but the com-

plainant swore in his affidavit in the matter of rehearing that he never made any request for an extension of the time. Moreover, there were but two sales made by the complainant after the 10-year period that were confirmed by Corbin. In one of them the contract of sale was doubtless made before, though the purchase-money mortgage was executed six days after, the expiration of the 10-year period. The other sale was made some time afterwards, but the circumstances surrounding it do not appear in the record. In each of these cases a conveyance was made by Corbin to the purchaser. But the complainant does not seriously contend that the time was extended by word or act of Corbin. The controversy is over the construction of the contract, and the complainant expressly complains that the few sales reported in 1887, after May 21st, were due to the fact that his authority as agent was impugned by Corbin's refusal to confirm what he did. The collection of the notes and mortgages that were outstanding on May 21, 1887, and the remittance of the collections to New York, was not done under the contract or in recognition of a continuation of it. The securities were payable at the complainant's bank, and it and Corbin's bank were mutual correspondents. What was done would have been done in the usual course of their business had no land contract existed.

The only remaining question is whether Corbin was entitled to 10 or to 7 per cent. interest upon his disbursements for taxes and expenses. The court allowed the latter. That he was entitled to interest at some rate was recognized by complainant in his letter of October 5, 1886, in which he includes interest in his tabulated statement. In casting up the accounts the trial court charged Corbin with 10 per cent. interest on every item of money which came to him from the sale of the lands from the date of its receipt to the date of the accounting May 21, 1887. In charging him with the uncollected purchase-money notes and mortgages, interest at the same rate was computed to the date of settlement. It needs no discussion to show that the taxes, foreclosure expenses, expenses for recording mortgages, etc., should be credited to Corbin in the joint account. Otherwise Corbin would not have stood in the same equal position with complainant had the venture reached the point where profits were to be divided. When cash proceeds, which came into Corbin's hands and upon which he was charged 10 per cent. interest, were properly paid out for taxes and expenses, it would follow that there should be a discontinuance of the 10 per cent. charge against Corbin to the extent of such disbursements. The same result is reached, however, by charging Corbin with interest at 10 per cent. upon all receipts, and crediting him with interest at 10 per cent. upon all such disbursements.

Five per cent. of the amount of proceeds of sales made by complainant under the contract, in cash and notes, equals $2,237.25, and for this amount he is entitled to a decree. It is equitable that the costs in the trial court where this result was made to appear should follow the recovery, and that complainant should bear the costs of the appeals to this court.

The decree of the trial court is reversed, with direction to enter a decree as above indicated.

SANBORN, Circuit Judge (dissenting). All agree that the contract was that the lands should be put into a joint account of Corbin and Bowman, and that they should remain there for 10 years. The question is, what were the rights and remedies of the parties at the expiration of this 10 years? The court below found that at the end of the 10 years this joint account had to its credit 6,445 acres of land worth $32,225, and notes and mortgages worth $11,600.55, and that it was indebted to Corbin in the sum of only $16,079.26, so that by the sale of the lands and notes it could be wound up, Corbin could get his money out and profits to the amount of $27,746.25 could be realized, and it held that the agreement of the parties was that in this state of the facts Bowman was entitled to have these profits divided. After a studious consideration of the record and of the opinion of my associates to the contrary, I am unable to agree with them, and I concur with the court below in its construction of this agreement. The question is, did these parties agree that if the joint account operated at the end of 5 years, and if at the end of 10 years it could be wound up so that Corbin could get his money out, Bowman should have half the profits? My views upon this question are these:

The question is, what was the contract? and there is no question whether or not time was its essence. If the contract was that if at the expiration of the 10 years Corbin had not got his money out Bowman should have nothing but 5 per cent. on his sales, he is entitled to that only. But if it was that, if at the expiration of the 10 years the joint account and the contract which created it could not be wound up so that Corbin could get his money out, he should have the 5 per cent., but that if it could be so wound up he should have half the profits, then he is entitled to half the profits, because it could have been thus wound up.

What might have been the rights of the parties if the joint account had not operated within the first five years, or if Bowman had not faithfully performed his part of the agreement, is irrelevant to the consideration or decision of this issue, because the joint account did operate within the five years, and Bowman did perform his part of the contract, and the true answer to it is in these words of the letter of May 12, 1877, which contain the proposition of Corbin that Bowman accepted:

"I will figure up exactly the cost as allowed the doctor, put them in to you on joint account to run 10 years at 10% annual interest; I to have my money out first, and when it comes out you to have half the profits. I want this limited to 10 years, because I don't want it running indefinitely in case it don't work. * * * But the contract shall run for ten years. Then if at the expiration of ten years it cannot be wound up, and I get my money out, I will agree that you will have 5% allowed on all sales that have been made, so that you will, in any event, not be doing this absolutely for nothing."

Bowman by his answer to this letter of May 21, 1877, did not intend to change, and did not reject or modify, any part of the provision of this proposition relative to the continuance and the winding up of the joint account. When he wrote in that letter the words, "I am to sell the lands and turn over all the proceeds to him until all his money invested with 10% interest is paid, etc., that at the end of the 10 years.

if he shall not have received all his money and interest out of the sales, the joint account shall be wound up and I shall have 5% for all the lands I have sold, etc., etc., as will more fully appear by reference to the copy of the letter on your books," he was simply identifying the proposition he was accepting as the one contained in the letter of May 12, 1877, as it was copied on the books of Corbin, and he was neither attempting to accurately state the proposition, as clearly appears by his repeated use of "etc.," and his reference to Corbin's books, nor to in any way reject or modify it. That he was not attempting to change and did not change it, but that he accepted it as it was written in Corbin's letter to which he referred, is demonstrated by these words in a later part of his letter:

"You may settle it down that I will accept that proposition fully and will do my level best to sell the land and look after the taxes and do everything such a proposition implies whether expressed in it or not."

The gist of the proposition and of the contract was that the lands should be put into a joint account of Corbin and Bowman, that Bowman should sell these lands, that out of this joint account Corbin should be first paid his advances and interest, and that the profits should be divided between them. All the other provisions of the contract, the 10 years during which the account and the sales should continue, its winding up, the payment of the 5 per cent. if upon its winding up it failed to pay out, were subordinate, modal, and incidental to this main purpose and substance of the contract.

When Corbin's proposition was accepted, the lands were placed in the joint account of Bowman and himself. From the moment of the acceptance of this proposition by Bowman, Corbin held these lands in trust for the joint account of himself and Bowman, to permit the latter to sell them for 10 years, to reimburse himself from the joint account for his advances, and to divide the profits of the sales and of the property in the joint account equally between himself and Bowman. When the 10 years expired he held them subject to this trust in this joint account under this contract. In the absence of an agreement relative to the rights and remedies of the parties at the expiration of this 10 years, there could be no doubt that any court of equity on the application of either of the cestuis que trust, Corbin or Bowman, would have decreed a winding up of the joint account, a sale of the trust property therein, the payment of Corbin's advances out of its proceeds, and the equal division of the remainder between them. The lands, notes, and mortgages in this joint account were charged with a trust to pay these advances and one half the remainder to Corbin, and by the same trust and to the same extent to pay the other half of the remainder to Bowman. Seymour v. Freer, 75 U. S. 202, 203, 206, 207, 213, 214, 215, 19 L. Ed. 306; Shaeffer v. Blair, 149 U. S. 248, 256, 257, 258, 13 Sup. Ct. 856, 37 L. Ed. 721. In Seymour v. Freer, the agreement was that Price should buy the lands, that Seymour should pay for them and take the title in his name, that the lands should be sold within five years, and that Price should have one-half the profits. Price bought the lands, Seymour paid for them and took the title in his name, none of them were sold within the five years, and if they had

been sold at the expiration of the five years there would have been no profit. Nevertheless, the court held that Price was entitled to the enforcement of the trust and to his share of the profits. It said:

"We think Seymour took the legal title in trust for the purposes specified. A trust is where there are rights, titles, and interests in property distinct from the legal ownership. In such cases, the legal title, in the eye of the law, carries with it, to the holder, absolute dominion; but behind it lie beneficial rights and interests in the same property belonging to another. These rights, to the extent to which they exist, are a charge upon the property, and constitute an equity which a court of equity will protect and enforce whenever its aid for that purpose is properly invoked. Interests in real estate, purely contingent, may be made the subjects of contract and equitable cognizance, as between the proper parties. The object of the trust here was to sell the property within the time limited, and, after deducting from the proceeds the outlay, with interest and taxes, to pay over to Price one-half of the residue. To this extent, Seymour was a trustee, and Price the cestui que trust. They had a joint interest in the property. Seymour held the legal title, but the rights of Price were as valid in equity as those of Seymour were at law.

"If Seymour, within the five years, had conveyed the property to one of his children, by way of advancement, or to a stranger, otherwise than upon a bona fide sale for its fair value, the grantee would have taken the title subject to the trust upon which Seymour held it, and a court of equity would have followed the property and dealt with it in all respects as if the title had still remained in Seymour. If a valid sale had been made, the trust would have followed and bound the proceeds in like manner as it bound the property."

So here at the expiration of the 10 years the lands and notes were charged with a trust to pay Bowman for the services he had rendered one-half of the profits, and were subject to his right to enforce the execution of this trust in equity by a sale of the property and the application of the proceeds according to its terms, unless there was some clear and unequivocal agreement that this trust was discharged and that this right to enforce it in equity and to receive the benefit of it was forfeited. There was no such agreement.

There was a provision that the joint account and the contract should run and be limited to 10 years, that Corbin should have his money out first, and that Bowman should have half the profits. But there was no stipulation in this agreement that, if at the expiration of the 10 years Corbin's money had not been paid out, Bowman should not receive or should forfeit his half of the profits or his equitable right to the customary sale of the trust property in chancery to pay the claim with which it was charged and to distribute the remainder among those who were equitably entitled thereto. On the other hand, the agreement was made in recognition of this right and on the assumption that it would be enforced. It reads:

"Then, if at the expiration of ten years it cannot be wound up, and I get my money out, I will agree that you will have 5% allowed on all sales that have been made, so that you will, in any event, not be doing this absolutely for nothing."

The contract was that Bowman should have the right, and should discharge the duty, to sell these lands for 10 years, and should have for his compensation one-half the profits; that to accomplish this result Corbin should put these lands into a joint account of Corbin and Bowman, and should thereby hold them and their proceeds in trust to repay his advances and interest and to divide the profits

equally between himself and Bowman; and that, if at the expiration of the 10 years this joint account and trust could not be wound up so that Corbin could get his money out, he would pay Bowman 5 per cent. on the sales he made so that he would "not be doing this absolutely for nothing." At the expiration of the 10 years the joint account, the trust property, and the contract which created it could be wound up in the customary method pursued by courts of equity to wind up trusts, joint accounts, and contracts of this nature by a sale of the property involved. Corbin could get his money out, and profits to the amount of $27,746.25. Why was not Bowman entitled to one-half of these profits? The parties contemplated and agreed that at the expiration of the 10 years the joint account and the trust property therein should first be wound up and closed out; that, if its proceeds paid Corbin's money back and left a profit, Bowman should have one-half of it. If they failed to pay Corbin's advances so that no profits accrued, and so that Bowman could get nothing from the joint account, then, and in no other event, in order that Bowman might not do his work for nothing whatever, Corbin would pay him the 5 per cent. on the sales. As at the expiration of the 10 years the joint account and the trust property therein could be wound up, and Corbin could get his money out and a large profit thereby, Bowman was entitled to one-half of this profit, and he was not entitled to 5 per cent. upon his sales.

One of the prayers of the bill is that the complainant may have "such other and further relief as may be just." The rights and equities of Bowman and his successor in interest, the complainant, were created and fixed by the contract of May, 1877, and in my opinion they have neither been forfeited nor destroyed by any of the misstatements relative to their existence or extent found in the negotiations for a settlement in 1886, or in the pleadings of the complainant made at the time when the counsel who drew them was evidently erroneously informed and hence alleged that Corbin's money and interest had been paid back to him before the expiration of the 10 years. In that supposed state of the facts the rights of the parties, in case it had not been so paid back, were immaterial, and an erroneous statement regarding them could not have worked an estoppel in any event, because Corbin knew the contract as well as Holmes. Courts of equity do not forfeit just claims for thousands of dollars on account of exaggerated or mistaken statements of the rights or equities of litigants in their negotiations or pleadings, where they have not misled their opponents to their injury. Nor are these various statements persuasive to my mind of the meaning or effect of this contract, because, for the reasons which have been stated, the plain words of the agreement, in the light of the established rules and practice in equity, are in my judgment unambiguous, clear, and conclusive upon that question.

In the discussion of the vital question in this case the amounts found by the court below have been used because it was immaterial to the argument whether Corbin should be allowed 7 per cent. or 10 per cent. upon the disbursements mentioned in the opinion of the majority. I agree with them that he should be allowed 10 per cent., and with this modification the decree ought, in my opinion, to be affirmed.