## LAUGHNER et al. v. SCHELL et al.

(Circuit Court of Appeals, Third Circuit. September 10, 1921.)

### No. 2687.

**Corporations ⊂⇒426(1)—Must ratify or repudiate contract as entirety.**

Where the directors of a corporation authorized, and both directors and stockholders ratified, a sale of property by an agent, with the understanding that it was agreed that the agent should receive a commission of 3 per cent. for his services, which commission was paid, neither the corporation nor a stockholder in its behalf can repudiate the agreement for the commission and recover the amount from the agent, or the officers who paid it, while retaining the benefit of the sale.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Ella F. Schell and another against the Minnetonka Oil Company, P. O. Laughner, C. A. Cooper, and others. Decree for complainants, and defendants Laughner and Cooper appeal. Reversed.

Arthur E. Young, of Pittsburgh, Pa., for appellants.

John G. Frazer and Reed, Smith, Shaw & Beal, all of Pittsburgh, Pa., for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

DAVIS, Circuit Judge. This was a stockholders' bill, filed against the Minnetonka Oil Company, hereafter called the company, a corporation of the commonwealth of Pennsylvania, and P. O. Laughner, president, C. A. Cooper, treasurer, and H. J. Wheeler, a director, to account

---

to the company for $41,250 commission, paid to A. V. Laughner for negotiating the sale of the property of the company to the Prairie Oil & Gas Company, hereafter called the Prairie Company, located at Tulsa, Okl., for $1,375,000. The company desired to dispose of its property, and A. V. Laughner, son of P. O. Laughner, was employed to sell it. He owned 17 shares of stock, but had no other connection with the company. He was in New York City trying to sell the property on February 5, 1917, when a letter came from the Prairie Company inquiring if the defendant company's property in Oklahoma was for sale. The directors of the company conferred with A. V. Laughner over the prospect and terms of selling the property to the Prairie Company and finally sent him to Oklahoma to sell it. He was to receive a commission of 2 per cent. if he sold the property for $1,250,000. He agreed "to go on that condition, providing they would split all he got over $1,250,000"; but the company would not agree to the proposition, apparently fearing that, if he asked more than $1,250,000, negotiations would be broken off and a sale would not be effected. The vice president instructed Laughner not to ask more than $1,250,000, for that "would queer the deal, for it wasn't worth any more than that." With these instructions, A. V. Laughner, with a letter of authority as the company's agent, went to Oklahoma on February 11, 1917.

Upon his arrival at Tulsa, he surveyed the situation and began to negotiate with the Prairie Company. It offered $1,000,000, and Laughner asked $1,500,000. After numerous conferences between Laughner and the Prairie Company, and communications between Laughner and his father and the company, these negotiations resulted in an offer by the Prairie Company, of $1,375,000 for the property, exclusive of the company's gas and water works, which were included in the price of $1,250,000 originally agreed upon. These works were subsequently sold for $50,000, making $1,425,000 the company received for the property which it instructed Laughner to sell for $1,250,000; in other words, the company received $175,000 above its asking price.

While these negotiations were going on, Laughner took up with the company, through his father, the question of a larger commission. On Saturday night, February 17, 1917, the office of the company being closed, he telegraphed to his father that he "must have 3 per cent. to handle any more." After several other telegrams and a telephone conversation on Sunday, in which A. V. Laughner told his father that the Prairie Company offered $1,375,000 for the property, not including the gas and water works, conditioned upon a commission of 3 per cent. to him, P. O. Laughner on Monday called a meeting of the directors and submitted the proposition to them. All of the directors were present, and all but J. D. Conway voted to accept the offer. Their action was telegraphed to both Laughner and the Prairie Company, and they executed the agreement. On Thursday, February 22, 1917, Laughner returned to Pittsburgh with a check for one-half the purchase price. On February 24, 1917, another meeting of the board of directors was called, and all the members were present except J. D. Conway, who refused to attend because he "expected a ratification of what they had done" on February 19, 1917. The board, Conway absent, voted to

ratify the execution of the contract by A. V. Laughner, with a commission of 3 per cent. to him. On February 26, 1917, the holders of 401 shares of capital stock of the company ratified the sale.

There is no contention that this was not a good sale. All the directors and stockholders are not only satisfied, but gratified, with the price received, and consequently there is no desire on the part of any one to set aside the sale. The complainants, Ella F. Schell and J. E. Schell, and Mr. Conway, however, think that some of the directors should have made the sale personally and gratuitously, and thus saved the commission. Therefore the Schells brought this suit for the purpose of having Laughner return the commission paid him by the company.

The District Court held that the commission was illegally paid, and ordered P. O. Laughner and C. A. Cooper to repay it to the company, with interest, aggregating $50,696.25. It further held that the testimony was not sufficient to connect H. J. Wheeler with the payment to justify including him in the order. The reasons for the conclusions of the learned trial judge are briefly stated in the following paragraph from his opinion:

"Notwithstanding testimony to the effect that it was stated at the meeting of the board of directors on the 19th of February, 1917, that A. V. Laughner was to receive the full commission of 3 per cent., this court must find the fact to be that it was not clearly and definitely stated. The court reaches this finding because there is no evidence as to the exact language used by those who have testified that the information was given to the board, because the definite language used in the resolution indicates that A. V. Laughner was not to receive the commission, because the telegrams which P. O. Laughner had in his pocket indicated that the deal was held up by the demand of somebody other than A. V. Laughner because of the positive testimony of the director, J. D. Conway, that no such information was given, and because the board had some time previously been informed by A. V. Laughner, who was figuring upon a sale of this property in New York, that he would be compelled to give the man in New York a commission to put the deal through. In addition to this, the very witnesses who testified that information was given at that meeting of the board that A. V. Laughner was to receive the commission testified positively that, at different times after that meeting, Director J. D. Conway repeatedly asked who was to receive the commissions."

The complainants take the position here that neither the employment of A. V. Laughner nor the payment of a commission to him was ever authorized or ratified; that he "did not earn a commission," and, even if he was employed and did earn a commission, he forfeited his right to it by his actions.

If the board of directors authorized Laughner to execute the contract, including 3 per cent. commission to him, with the Prairie Company, or ratified it, the commission should be paid. The board of directors evidently thought it had authorized the contract with the commission by its resolution on February 19, 1917. A. V. Laughner telegraphed on February 17, 1917, to P. O. Laughner that he "must have 3 per cent." Four witnesses testified that at the meeting two days later P. O. Laughner said that he had received a telegram from A. V. Laughner, stating that he could make a sale of the property for "$1,375,000, conditioned on 3 per cent. commission to him." "That was definitely understood," they said. With this information the board of directors passed the following resolution:

"The board of directors hereby authorize A. V. Laughner to sign contract for sale of our property in Oklahoma as agreed upon between the Prairie Oil & Gas Company and A. V. Laughner."

All the directors except J. D. Conway voted for it, and it was telegraphed to A. V. Laughner and the Prairie Company.

The directors doubtless thought they ratified on February 24, 1917, what they authorized on February 19, 1917. They also thought their action was ratified by four-fifths of the stockholders on February 26th, two days later. If there was a contract, it must be either ratified or repudiated as a whole. It may not be ratified in part and repudiated in part. Mundorff v. Wickersham, 63 Pa. 87, 3 Am. Rep. 531; 31 Cyc. 1257.

If there was not an express contract to pay Laughner a definite amount, there was an implied contract to pay him what his services were reasonably worth, and, since a commission of 3 per cent. has been paid, the question to be determined, on this view of the case, is whether or not that amount was unreasonable, or such as to shock the conscience of the court. It appears to us that A. V. Laughner did a remarkably clever piece of work in the sale of the property. No one had an idea that the company could get $1,375,000 for it, without the gas and water works. The company asked only $1,250,000. If he had obeyed instructions, the company would have received, clear of commissions, $1,225,000 for the property, and apparently everybody, even Mr. Conway, was satisfied with that. The first offer by the Prairie Company was $1,000,000, and many a man according to instructions would have asked only $1,250,000; but Mr. Laughner exceeded his authority and asked $1,500,000. Because he followed his own judgment, the company received for that property, including the gas and water plants, clear of commission, $1,383,750.

The fact that A. V. Laughner disobeyed instructions, exercised independent judgment, and sold the property for $1,375,000, is evidence that the company used good judgment in selecting him as its agent. Besides negotiating the sale, he looked after the abstracts of title of all the property sold and did all the work in connection with the transfer of the property, so that the company was not compelled to employ a lawyer. Laughner was an experienced man in the oil business and in the sale of oil properties. He was treasurer of the Schell Oil & Gas Company, secretary and treasurer of the Crescent Oil & Gas Company, and connected with the National Products Company and the Malou Oil Company. He sold oil companies both before and after the sale in question, and was said to know more about the Minnetonka Company than any other person. In view of all the facts in the case, we cannot say that 3 per cent. commission is unreasonable.

There is an aspect of this case which, in our opinion, is dispositive of it, and renders it unnecessary to pass upon the various questions raised in the opinion and briefs: Neither an individual nor a corporation may accept the benefits of a contract, though unauthorized, and refuse its burdens. Presbyterian Board v. Gilbee, 212 Pa. 310, 61 Atl. 925; First National Bank of Bangor v. Am. Bangor Slate Co., 229 Pa. 27, 77 Atl. 1100; Hartzell v. Ebbvale Mining Co., 239 Pa. 602, 86 Atl. 1093.

What the corporation itself may not do may not be done by two stockholders acting in its behalf. Neither the company nor any director or stockholder acting individually has seen fit to repudiate or to start proceedings to repudiate the sale. Admittedly it was a good one, as all parties interested well know. It follows that the payment should stand, and the decree of the District Court should be reversed, unless A. V. Laughner "forfeited his right to a commission by his actions."

The general rule is that every contract, both express and implied, must fall before fraud. An agent who perpetrates a fraud upon his principal in executing his agency forfeits his right to compensation for services. Pratt v. Patterson, 112 Pa. 475, 3 Atl. 858; Shaeffer v. Blair, 149 U. S. 248, 258, 13 Sup. Ct. 856, 37 L. Ed. 721; 2 Corpus Juris, 760. Was Laughner guilty of such fraud in this case as bars compensation, express or implied, for his services? It is true that, after Laughner discovered that he could secure $1,375,000 without the gas and water works, he began negotiations for a 3 per cent. commission. A careful examination of the testimony convinces us that he disclosed to the company every material fact necessary to enable it to act understandingly at its meetings on February 19 and 24, 1917, and apparently everybody except Mr. Conway fully understood the terms of the contract with the Prairie Company and with him. We fail to see any concealment or fraud that deceived any one, or that forfeits his right to a commission. The decree of the District Court will therefore, with instructions to dismiss the bill, be reversed.